**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**LSL BIOTECHNOLOGIES; Seminis Vegetable Seeds, Inc.; LSL Plantscience LCC, Defendants–Appellees.**

No. 02–16472.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 5, 2003.

Submission Withdrawn Dec. 18, 2003.

Resubmitted July 27, 2004.

Filed Aug. 11, 2004.

Steven J. Mintz, U.S. Department of Justice, Antitrust Division, Washington, D.C., for the plaintiff-appellant.

Thomas F. Connell and Jeffrey D. Ayer, Wilmer, Cutler & Pickering, Washington, D.C., for defendants-appellees LSL Biotechnologies, Inc. and LSL Plantscience LLC.

Sabina Bhalla, Milbank, Tweed, Hadley & McCloy LLP, Los Angeles, CA, for defendant-appellee Seminis Vegetable Seeds, Inc.

Before ALDISERT,* TALLMAN, and RAWLINSON, Circuit Judges.

Opinion by Judge TALLMAN; Dissent by Judge ALDISERT.

TALLMAN, Circuit Judge:

We must decide whether the district court erred by determining that it lacked subject matter jurisdiction over this antitrust action. The United States alleged that an agreement between the defendants (collectively, "LSL") and an Israeli company, Hazera Quality Seeds, Inc., violates the Sherman Act. Because the challenged agreement does not have a direct, substantial, and reasonably foreseeable effect on United States commerce, we affirm the district court's dismissal.

I

This dispute grows out of a joint business venture—always a fertile ground for litigation—that sought to solve the dilemma of how to bring fresher, tastier tomatoes to Americans who live in the northern part of the nation and therefore suffer from a lack of fresh tomatoes in the winter months.

In the early 1980s, LSL Biotechnologies, Inc., an American corporation that develops and markets seeds, entered into a relationship with Hazera. LSL began working with Hazera in the hope of developing a genetically-altered tomato seed that would produce tomatoes with a longer shelf-life. LSL and Hazera wanted to create such a tomato because, until recently, tomatoes had a very short shelf-life if they were picked from the vine already ripened. This means that tomato growers can only sell their product in a limited geographic area. Because most of the American climate cannot produce tomatoes during the winter months, consumers are unable to access vine-ripened tomatoes for much of the year. Instead, most United States consumers are relegated to eating foreign tomatoes that are picked before they are ripe, so they will still be fresh after shipping. Tomatoes picked in this fashion have a poor flavor compared to vine-ripened tomatoes.

To solve this dilemma, LSL and Hazera sought to develop a tomato with enough shelf-life after reddening on the vine to travel from growing locations primarily in Mexico to the rest of the American market before spoiling. On January 1, 1983, LSL and Hazera signed a contract that regulated their relationship in this joint endeavor. The contract allocated to each party exclusive territories in which they could sell the seeds they developed together and seeds that each party developed on its own. The contract provided that LSL would have the exclusive rights to the North American market.

LSL and Hazera eventually bred a ripening-inhibitor ("RIN") gene into tomato seeds to be grown in open fields. The RIN gene caused tomatoes to remain fresh longer after being picked. LSL obtained a patent for tomatoes and seeds containing the RIN gene; Hazera obtained no rights to the patent. The RIN gene tomatoes proved to be exceptionally successful when grown in Mexican climates, but failed to take in cooler American climates. As a result, Mexican growers now dominate the fresh winter-tomato market. To date, Hazera has not developed a long shelf-life tomato seed.

The relationship between LSL and Hazera soon withered. Litigation ensued. In

* Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

1987, Hazera sued LSL in an Israeli court. This foreign litigation led to mediation in Israel that produced the renegotiation of and addendum to the contract. The addendum included a Restrictive Clause, which is the device the United States now claims violates the Sherman Act. The Restrictive Clause originally stated:

> Subsequent to the termination of the Agreement hereunder, Hazera shall not engage, directly or indirectly, alone, with others and/or through third parties, in the development, production, marketing or other activities involving tomatoes having any long shelf life qualities. However, in the event that Hazera shall be requested by any third party to produce seeds of tomatoes having long shelf life qualities, Hazera may engage in such activities only if all of the following conditions are met: (A) the subject tomatoes do not have or involve long shelf life qualities which are included in LSL's proprietary rights; (B) Hazera shall not engage in such production prior to the year 2000 or prior to the expiration of 5 years following the termination of the Agreement, whichever occurs later, and (C) Hazera has obtained LSL's advanced written consent, which shall not be unreasonably withheld.... LSL shall determine whether or not the proposed cooperation may involve any of its proprietary rights and shall not unreasonably withhold its consents to such production.

LSL and Hazera continued working together after adopting the Restrictive Clause, despite frequent returns to the legal system. In 1992, the parties modified the contract a final time and requested that an Israeli arbitrator "incorporate their final contract modifications into a stipulated arbitration order." The arbitration settlement affirmed the Restrictive Clause's ban on Hazera selling long shelf-life tomato seeds in North America. But the Restrictive Clause was amended to allow Hazera to sell other seeds (*e.g.*, tomato seeds for growing in greenhouses) to North American consumers, provided that Hazera disclose the details of such sales to LSL.

The contract between Hazera and LSL expired on January 1, 1996, and the Restrictive Clause became effective. On September 15, 2000, the United States filed its antitrust complaint. The government alleged that the Restrictive Clause is "so overbroad as to scope and unlimited as to time as to constitute a naked restraint of trade in violation of Section 1 of the Sherman Act." The government also alleged that the Restrictive Clause is illegal because "it has harmed and will continue to harm American consumers by unreasonably reducing competition to develop better seeds for fresh-market, long shelf-life tomatoes for sale in the United States."

The government alleged that "[b]ut for the[Restrictive Clause], Hazera would likely be a significant competitor of [LSL] in North America." The Complaint stated that the defendants [1] collectively held more than 70 percent of the market for "fresh market tomato seeds." Nonetheless, LSL's competitors control a significant percentage of the market for "fresh market tomato seeds": Novartis and Monsanto together possess around twenty percent of the market, while several other companies together account for the remaining ten percent.

---

1. The Complaint names as defendants LSL, Seminis Vegetable Seeds, Inc., and LSL Plantscience LLC. At the time of the Complaint, Seminis and LSL each owned half of Plantscience; Plantscience was the repository for all of LSL's tomato seed assets, including the Restrictive Clause.

The portion of the Complaint titled "Anticompetitive Effects" alleged that the exclusion of Hazera from the North American market eliminated "one of the few firms with the experience, track record and know-how likely to develop seeds that will allow United States and other North American farmers to grow better fresh-market tomatoes for United States consumers during winter months." The government also alleged that the "Restrictive Clause may also allow defendants to charge more for their seeds (or more for a license to use seeds with the RIN gene) than they otherwise would."

LSL filed a motion to dismiss the Complaint, arguing that the government failed to state a cause of action and that the district court lacked subject matter jurisdiction. In support of their positions regarding subject matter jurisdiction, the parties submitted declarations and other evidence. After hearing oral argument, the district court granted LSL's motion.

The district court's approach was to divide the Complaint into separate domestic and foreign components, because the area of restraint (North America) covered both domestic and foreign markets.

The district court first concluded that the Complaint failed to state a cause of action regarding conduct in the United States and dismissed that aspect of the action without prejudice under Federal Rule of Civil Procedure 12(b)(6). The court concluded that the Complaint's market definition was so poor that the Complaint failed to establish anti-competitive effects. The United States chose not to amend its defective complaint.

The district court then held that it lacked jurisdiction over the claim that the restriction on the sale of seeds to Mexico violated the Sherman Act and dismissed that aspect of the Complaint *with* prejudice under Rule 12(b)(1). In order to seek immediate appellate review, the government, rather than replead the domestic conduct aspect of the Complaint, requested that the district court dismiss the entire action with prejudice. The request was granted and the government perfected its appeal to this court under 28 U.S.C. § 1291.

## II

■ As an initial structural matter we must decide whether it was proper for the district court to divide the consideration of the Complaint into domestic and foreign components.

LSL moved to dismiss the Complaint, arguing primarily that the district court lacked subject matter jurisdiction. The motion very briefly urged that the whole Complaint—not just the domestic aspect—also failed to state a cause of action. LSL's attack on the Complaint is not split into distinct "domestic" and "foreign" aspects. Likewise, the government's opposition to LSL's motion does not defend the Complaint in this fashion. The government concentrated the bulk of its response on the district court's subject matter jurisdiction, while briefly answering LSL's assertion that the entire Complaint failed to state a cause of action.

The district court evaluated different parts of the Complaint under different standards. On the one hand, the court considered whether the allegations in the Complaint concerning the restriction on selling seeds to the United States stated a cause of action under Rule 12(b)(6). The district court was satisfied that it had subject matter jurisdiction over this component of the Complaint. On the other hand, the district court analyzed whether the court had subject matter jurisdiction over the portion of the Complaint alleging a restraint on the sale of seeds to Mexico

under Rule 12(b)(1) and the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ("FTAIA").

Of course, the parties' arguments did not prevent the district court from separately considering the Complaint's domestic and foreign allegations. Nonetheless, we think this two-pronged approach was not the most appropriate way to analyze the motion to dismiss. The threshold question in this case is whether the district court had subject matter jurisdiction. That inquiry pervades the entire Complaint; the government alleged only one cause of action, which lumped together the Restrictive Clause's ban on distributing certain modified tomato seeds to Mexico and the resulting fruit in the United States.

■ Where, as here, a Complaint alleges a restraint of trade on a foreign corporation, that restraint was executed in a foreign nation as the result of litigation in that foreign nation, and the defendants file a Rule 12(b)(1) motion to dismiss the entire Complaint for lack of subject matter jurisdiction, a court should determine its subject matter jurisdiction to entertain the entire Complaint. Accordingly, we consider whether the district court had subject matter jurisdiction over the entire Complaint, including the "domestic" allegations.

## III

We review de novo the district court's dismissal for lack of subject matter jurisdiction. *La Reunion Francaise SA v. Barnes,* 247 F.3d 1022, 1024 (9th Cir.2001). Factual findings made in support of the dismissal are reviewed for clear error. *Id.*

## IV

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 1. Federal courts have struggled for decades to determine when United States courts have jurisdiction over allegations of foreign restraints of trade. *See* Areeda & Hovenkamp, ANTITRUST LAW, ¶ 272 (2d ed.2000); *see also Den Norske Stats Oljeselskap As v. HeereMac v.o.f., et al.,* 241 F.3d 420, 423–24 (5th Cir.2001) ("The history of this body of case law is confusing and unsettled.").

Prior to the passage of the FTAIA, courts applied varying tests to determine when foreign conduct fell within the purview of the Sherman Act. The most widely used standard was the "effects test," which was developed by Judge Learned Hand in *United States v. Aluminum Co. of Am.,* 148 F.2d 416, 444 (2d Cir.1945) (*"Alcoa"*).[2] The *Alcoa* court considered whether Congress intended the Sherman Act to impose liability for conduct outside of the United States and whether the Constitution allowed Congress to do so. Judge Hand rejected the idea that Congress meant "to punish all whom[United States] courts can catch, for conduct which has no consequences within the United States." *Id.* at 443. Instead, the court held that the Sherman Act was meant to reach foreign conduct only if it was intended to and did affect United States commerce. *Id.* In *Hartford Fire Ins. Co. v. California,* the Supreme Court summarized the effects test, stating that "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial

---

**2.** The *Alcoa* court sat as a court of last resort pursuant to 15 U.S.C. § 29, which at the time authorized the designation of a court of appeal as the final stop in certain antitrust actions. *Alcoa,* 148 F.2d at 421.

effect in the United States." 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (citing *Alcoa* ).

■ Application of the effects test, however, has proved difficult and the precise extraterritorial reach of the Sherman Act remains less than crystal clear. In an effort to address this uncertainty, Congress enacted the FTAIA in 1982. The FTAIA "was intended to exempt from the Sherman Act export transactions that did not injure the United States economy." *Hartford Fire,* 509 U.S. at 796–97 n. 23, 113 S.Ct. 2891. According to the House Report, another significant purpose of the FTAIA was to fix the problem that arose because "courts differ in their expression of the proper test for determining whether United States antitrust jurisdiction over international transactions exists." H.R.Rep. No. 97–686 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487 ("House Report") at 2487. The FTAIA tackled this issue by "clarifying the Sherman Act ... to make explicit [its] application only to conduct having a 'direct, substantial and reasonably foreseeable effect' on domestic commerce." *Id.* Specifically, the FTAIA states:

> Sections 1 to 7 of this title [including the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
>
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect—
>
> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under he provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a.

Federal courts did not shower the FTAIA with attention for the first decade after its enactment. But in the last ten years, and in particular the last five years, the case reporters have steadily filled with decisions interpreting this previously obscure statute. As a threshold matter, many courts have debated whether the FTAIA established a new jurisdictional standard or merely codified the standard applied in *Alcoa* and its progeny.

Several courts have raised this question without answering it. The Supreme Court did as much in *Hartford Fire.* The *Hartford Fire* Court considered the jurisdictional status of an alleged conspiracy among London-based re-insurers to manipulate the American insurance market by not offering certain types of re-insurance. The Court introduced its jurisdictional analysis by noting that the effects test is well established. *Hartford Fire,* 509 U.S. at 796, 113 S.Ct. 2891. In a footnote, the Court stated that it is not clear "whether the [FTAIA's] 'direct, substantial, and reasonably foreseeable effect' standard amends existing law or merely codifies it. We need not address these questions here." *Id.* at 796 n. 23, 113 S.Ct. 2891.[3]

---

**3.** The Court devoted very little attention to whether jurisdiction existed. After concluding that the bare minimums were met, the Court quickly turned to a more robust discussion of whether principles of international comity should have prevented the exercise of jurisdiction. *Id.* at 797, 113 S.Ct. 2891.

It is manifest that our role is to apply the laws that Congress passes and the executive branch enforces unless those laws violate the Constitution. There is no suggestion that the FTAIA is unconstitutional. Thus, we must adhere to the FTAIA in determining whether a district court has subject matter jurisdiction over an alleged foreign restraint of trade. The government contends that the FTAIA merely codified the existing common law regarding when the Sherman Act applies to foreign conduct and that we should continue to employ the *Alcoa* effects test. We reject this contention.

Our task when interpreting legislation is to give meaning to the words used by Congress; we strive to avoid constructions that render words meaningless. *See United States v. Fiorillo,* 186 F.3d 1136, 1153 (9th Cir.1999). The FTAIA states that the Sherman Act shall not apply to foreign conduct unless it has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. 15 U.S.C. § 6a(1). The Supreme Court reads the *Alcoa* test as conferring jurisdiction so long as the conduct creates "some substantial effect in the United States." *Hartford Fire,* 509 U.S. at 796, 113 S.Ct. 2891. Unlike the FTAIA, the *Alcoa* test does not require the effect to be "direct." Adopting the government's argument and applying the *Alcoa* test would render meaningless the word "direct" in the FTAIA.[4] We are not willing to rewrite a statute under the pretense of interpreting it.

Moreover, applying *Alcoa* instead of the FTAIA would contravene the FTAIA's purpose. The FTAIA created its jurisdictional test because the "enactment of a single, objective test—the 'direct, substantial, and reasonably foreseeable effect'

test—will serve as a simple and straightforward clarification of existing American law." House Report at 2487–88. The House Report goes on to state: "The specific purpose of the Sherman Act modification is: to more clearly establish when antitrust liability attaches to international business activities." *Id.* at 2492.

It would be a serious departure from the goal of achieving clarity for us to conclude that Congress meant only "some substantial effect," *Hartford Fire,* 509 U.S. at 796, 113 S.Ct. 2891, when it said "direct, substantial, and reasonably foreseeable effect." Clarity is not achieved by employing three modifiers ("direct," "substantial," and "reasonably foreseeable") as the standard for the required effect of the challenged conduct and then telling businesses that only one modifier ("substantial") is relevant to Sherman Act liability.

Our precedent supports the conclusion that the FTAIA provides the guiding standard for jurisdiction over foreign restraints of trade. Most notably, in *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802 (9th Cir.1988), we considered an antitrust claim that the defendants' refusal to deal in pipe-manufacturing products "in various foreign markets" violated the Sherman Act. *Id.* at 813. The district court dismissed the claim because it failed to satisfy the FTAIA's test for subject matter jurisdiction. We determined without difficulty that "we are bound to apply [the FTAIA]," *id.* at 813 n. 8, and affirmed the district court, concluding that "appellants have failed to allege that the defendants' conduct has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce or import trade." *Id.* at

---

**4.** Applying *Alcoa* might also ignore the words "reasonably foreseeable," although we recognize that foreseeability might be a concept inherent in any scheme that seeks to impose liability.

815.[5]

■ As in *McGlinchy*, we conclude that the FTAIA controls in this case. Therefore, we must affirm the district court's dismissal for lack of subject matter jurisdiction unless we determine that the Restrictive Clause operates to have a direct, substantial, and reasonably foreseeable effect on domestic commerce.[6]

## V

Before discussing whether there is a direct effect here, we must consider what Congress meant by "direct." A dictionary published contemporaneously with the enactment of the FTAIA defined "direct" as "proceeding from one point to another in time or space without deviation or interruption." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 640 (1982).

Further, our efforts at understanding the meaning of "direct" are aided by the Supreme Court's interpretation of a nearly identical term in the Foreign Sovereign Immunities Act ("FSIA"). The FSIA states that immunity does not extend to commercial conduct "outside the territory of the United States ... that [ ] causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). After the lower federal courts struggled for years to define "direct effect," the Supreme Court unanimously declared that an effect is "direct" if it follows as an immediate consequence of the defendant's activity. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). Settling on this definition, the Court "reject[ed] the suggestion that ['direct'] contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Id.*

■ Having defined "direct," we next consider what effects the government asserts. As the district court recognized, the Complaint alleges that the Restrictive

---

5. Other circuits have also treated the FTAIA as the binding test for determining jurisdiction over foreign restraints of trade. For example, in *United Phosphorous, Ltd. v. Angus Chem. Co.*, the Seventh Circuit thoroughly analyzed the FTAIA and concluded that "the legislative history shows that jurisdiction stripping is what Congress had in mind in enacting FTAIA." 322 F.3d 942, 951 (7th Cir.2003) (en banc). The court then applied the FTAIA jurisdictional standards and affirmed the district court's dismissal for lack of subject matter jurisdiction. *Id.* at 952–53; *see also Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 304–05 (3d Cir.2002) (affirming dismissal because the FTAIA's test was not satisfied); *Den Norske*, 241 F.3d at 425–29 (applying the FTAIA to determine whether subject matter jurisdiction existed); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1085 (D.C.Cir.1998) ("It does seem clear, however, that we should use the standard set forth in the FTAIA to analyze whether conduct related to international trade has had an effect of the nature and magnitude necessary to provide us with subject matter jurisdiction.").

6. Unlike the government, the dissent does not argue that the effects need not be direct, but rather that the directness requirement has *always* been part of the "effects test." Thus, the panel agrees on the standard; we merely disagree about its source. We say it is the FTAIA, while the dissent says the common law. We all recognize that conduct related to international trade is exempt from the Sherman Act unless it has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. Under either approach, the dispositive question is whether the Restrictive Clause operates to have a direct effect on U.S. commerce. We think the allegations in the government's complaint, even if taken to be true on a motion to dismiss, are insufficient to establish the effect required under the FTAIA. As currently pleaded, it is sheer speculation as to whether Hazera will ever be able to develop its own version of long shelf-life tomatoes suitable for growing in North America during the winter.

Clause causes two effects: (1) the agreement makes less likely possible innovations from Hazera in the creation of heartier tomato seeds "that will allow consumers to enjoy higher quality, better tasting winter tomatoes and that will allow United States farmers to grow long shelf-life tomatoes," and (2) the Restrictive Clause "may also allow defendants to profitably charge more for their seeds (or more for a license to use seeds with the RIN gene) than they otherwise could."

Neither of these effects is "direct." The delay of possible "innovations" does not have a direct effect on American commerce. Even if Hazera were free to distribute new types of long shelf-life seeds in North America, there is no indication that Hazera has yet figured out a different way to produce such a seed without violating LSL's intellectual property rights to the RIN gene. Moreover, there is no indication that Hazera is in a stronger (or as strong a) position to develop such a new seed as Monsanto and Novartis, which the Complaint alleges already account for 20 percent of the tomato seed market. Thus,

any innovation that Hazera would bring to American consumers is speculative at best and doubtful at worst. An effect cannot be "direct" where it depends on such uncertain intervening developments. In this case, Hazera's delivery of long shelf-life seeds to North American growers depends on Hazera first creating such seeds, a development that is certainly not guaranteed.[7]

We can imagine a situation where the exclusion of a potential foreign competitor would satisfy the "direct" requirement. One such scenario might be where the foreign competitor already has the good in hand. It might also be possible for a "direct" effect to exist where the potential foreign competitor does not yet have the product in hand. A potential foreign competitor might be able to demonstrate that its exclusion already has an effect on the American market. For example, the competitor might be able to demonstrate that its exclusion is causing existing market players to invest less in the research and development of new products. Although it might be possible in such situations for a

---

7. The dissent consistently refers to Hazera's seeds as though they actually exist; it fails to appreciate that Hazera has not yet developed its own long shelf-life tomato seeds capable of cultivation in North America. *See* Dissent at 694 ("First, the Complaint squarely alleged causation in fact: but for the restraint, United States consumers would have the important potential of better winter tomatoes grown from Hazera seeds."); *id.* at 694 ("Consumers in the United States are the persons injured by the Restrictive Clause, as they are the ones deprived of the superior tomatoes that competition from Hazera could bring."); *id.* at 695 ("... ignoring the effect of that conduct, which is to deprive the United States consumers of winter tomatoes from Hazera seeds."). We do not read the allegations of ¶¶ 38–39 of the government's Complaint as generously as our colleague in dissent. *See* Dissent at 695 n. 6.

Likewise, the government maintains that it demonstrated that Hazera can produce a

long shelf-life seed that does not infringe on LSL's patents. But the document to which the government cites—a declaration from Hazera's president—speaks in purely forward-looking terms: "Hazera is now *developing* seeds for a winter tomato variety.... Hazera *intends* to develop a seed that produces a tomato that tastes better while staying firm without gassing or the RIN gene.... Hazera *will also launch* a program to develop improved extended shelf-life tomatoes for growers in California." (emphasis added). We find no express allegation that Hazera has actually produced a modified seed that can be successfully grown in North America for long shelf-life winter tomatoes. In sum, the record reveals that such seeds do not yet exist and the prospect of Hazera developing seeds that do not infringe LSL's patent is at best speculative. As a matter of common sense, regardless which of the many definitions of "direct" one adopts, this fact is crucial to the "direct effect" calculus.

"direct" effect to exist, the United States has not presented us with sufficient evidence to conclude that the district court clearly erred in ruling on the existing pleadings that Hazera's exclusion does not yet have a direct effect on domestic commerce.

The district court also held that the effect of the Restrictive Clause on prices paid by American consumers is not "direct." This ruling was not clearly erroneous. The government has presented no evidence that LSL has or will artificially inflate the prices it charges to Mexican farmers for LSL's long shelf-life seeds.

Perhaps more importantly, the government's argument about the directness of the effect of seed prices on tomato prices is undermined by the United States' recent agreement with Mexican farmers to set a floor on the price of tomatoes shipped from Mexico to the United States. SUSPENSION OF ANTIDUMPING INVESTIGATION: FRESH TOMATOES FROM MEXICO, 67 Fed.Reg. 77044 (Dec. 16, 2002). The agreement covers all "fresh or chilled tomatoes (fresh tomatoes) which have Mexico as their origin." *Id.* at 77046. The agreement fixes minimum prices that Mexican tomato growers must charge for their product. *Id.* at 77045–50. The agreement was necessary to "eliminate completely the injurious effect of exports to the United States of the subject merchandise and prevent the suppression or undercutting of price levels of domestic fresh tomatoes by imports of that merchandise from Mexico." *Id.* at 77045. The government initiated the investigation that led to the agreement because it was determined that Mexican tomato growers were selling their product "in the United States at less than fair value." *Id.* This agreement, and the concerns that gave rise to it, belie the United States' argument that

LSL could raise the prices ultimately paid by American tomato consumers.

The government cites two cases in support of its argument that the Restrictive Clause has a "direct" effect on American commerce. First, the government points to *Hartford Fire.* However, the defendants in *Hartford Fire* "apparently concede[d]" that the district court had jurisdiction; rather than challenge the existence of jurisdiction, the defendants argued that the district court should decline to exercise jurisdiction because of comity concerns. 509 U.S. at 795, 113 S.Ct. 2891. Also, the *Hartford Fire* defendants' foreign conduct—not offering re-insurance—had a demonstrated impact on the American insurance market: certain types of primary insurance were made unavailable because primary insurers could not obtain necessary re-insurance. Here, the product "loss" suggested by the government is entirely speculative: but for the Restrictive Clause, Hazera might someday create a long shelf-life tomato seed suitable for growing by North American farmers that does not violate LSL's existing patents. While the Restrictive Clause in this case removes nothing from American consumers except the vague possibility that Hazera might create a new type of seed before Novartis or Monsanto or one of the other smaller competitors, conduct by the defendants in *Hartford Fire* actually deprived American consumers of a wider array of an existing product, primary insurance.

The government also relies on the Fifth Circuit's decision in *Den Norske.* Like *Hartford Fire, Den Norske* differs in at least one critical way from this case. In *Den Norske,* the plaintiff alleged that the defendants caused Americans to pay $165 million in higher oil prices because the defendants' conspiracy raised the prices paid by off-shore oil producers for heavy-lift services in the Gulf of Mexico and the

producers passed on the higher prices to American oil consumers. 241 F.3d at 426 & n. 21. By contrast, here the government cannot demonstrate an existing effect on American tomato consumers. At most, the government can demonstrate that the Restrictive Clause removes the *possibility* of future innovation from Hazera and "*may* also allow defendants to profitably charge more for their seeds."

In assailing the district court's jurisdictional ruling, the dissent invokes the general notice pleading standard. *See, e.g.,* Dissent at 692–93 n. 5 ("Here, the government sufficiently averred that the adverse effect on the United States' domestic commerce of tomatoes has been an immediate consequence of the Restrictive Clause governing tomato seeds ...."); *id.* at 694 ("First, the Complaint squarely alleged causation in fact: but for the restraint, United States consumers would have the important potential of better winter tomatoes grown from Hazera seeds."). However, while federal complaints are generally construed liberally, in this case the district court correctly scrutinized the government's Complaint more closely in order to make the necessary threshold determination of whether it had subject matter jurisdiction. This scrutiny involved taking preliminary evidence, weighing that evidence, and deciding as a matter of law whether the facts alleged supported jurisdiction. Here, the district court properly found that the operation of the Clause does not have the required direct effect on U.S. commerce. We agree and hold that as a matter of law the FTAIA does not confer jurisdiction.[8]

### VI

The FTAIA provides the standard for establishing when subject matter jurisdiction exists over a foreign restraint of trade. This standard was not met here because the government cannot demonstrate that the district court clearly erred by determining that the alleged effects of the Restrictive Clause are not direct.

Because we conclude that the district court lacked subject matter jurisdiction over the entire Complaint, we do not consider the district court's Rule 12(b)(6) dismissal of the domestic aspect of the Complaint.

**AFFIRMED.**

ALDISERT, Circuit Judge, Dissenting:

This is a case of first impression. The panel is unanimous in agreeing that this appeal requires us to interpret critical language in the Foreign Trade Antitrust Improvements Act (FTAIA or "Act"), 15 U.S.C. § 6a (1994). We must express a judicial interpretation to a single word, "direct," in the FTAIA's provision of "direct, substantial, and reasonably foreseeable effect" on United States trade or commerce when foreign activity is involved. The flash point of controversy, however, is whether the word "direct" in the FTAIA is a new dimension added to traditional antitrust law that involves trade or commerce with foreign nations, as the majority concludes, as did the district court, or, as urged by the government in this appeal, is merely a codification of antitrust law in place prior to the enactment of FTAIA. I agree with the government's interpreta-

---

8. In other words, the question of fact is whether, accepting the allegations of the Complaint as true, there is a "direct, substantial, and reasonably foreseeable effect," while the question of law is whether the FTAIA provides a basis for jurisdiction. The legal question here is relatively straightforward; because the district court's finding of no direct effect survives clearly erroneous appellate review, affirmance of its jurisdictional finding necessarily follows.

tion, and accordingly, respectfully dissent. I would reverse the judgment of the district court.[1]

## I.

Our analysis, perforce, must begin with the statutory language of FTAIA:

Section 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a *direct*, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a (emphasis added).

Although other appellate courts have dodged the critical issue on which this appeal turns,[2] this panel has decided to face the dragon in his teeth and stop tap dancing around the meaning of the word "direct." As did the district court in this case, the majority adopts the view that something new has been added by Congress in 1994 in enacting FTAIA—something that restricts the operation of the Sherman Act when foreign conduct is involved, a new ingredient requiring proof of a "direct" effect on American commerce.

I take a contrary view. I believe that the new statute merely codified existing antitrust law in the use of the word "direct." And so interpreted, under the facts in this case, which I adopt as laid down by the majority, a result contrary to that of the district court is mandated for the reasons that follow in detail.

## II.

The district court erred in dismissing the Complaint for lack of jurisdiction under the FTAIA by determining that the government failed to allege a "direct, substantial, and reasonably foreseeable effect" on United States commerce.

"We review de novo a district court's dismissal for lack of subject matter jurisdiction.... The district court's findings of fact relevant to its determination of subject matter jurisdiction are reviewed for clear error." *La Reunion Francaise SA v. Barnes*, 247 F.3d 1022, 1024 (9th Cir. 2001) (citations omitted).

The leading Supreme Court case discussing the FTAIA is *Hartford Fire Insurance Co. v. California*, 509 U.S. 764,

1. The district court also entered judgment against the United States for failure to state a claim for which relief could be granted. Rule 12(b)(6), Federal Rules of Civil Procedure. Because the majority affirms the dismissal under Rule 12(b)(1) it does not meet this issue. In light of the view I take, it will be necessary for me to discuss this question, *infra*.

2. *See, e.g., Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 789 n. 23, 113 S.Ct. 2891, 125

L.Ed.2d 612 ("Also unclear is whether the Act's 'direct, substantial, and reasonably foreseeable effect' standard amends existing law or merely codifies it.... We need not address these questions here.") (citation omitted); *see also Dee–K Enter., Inc. v. Heveafil Sdn. Bhd*, 299 F.3d 281, 287 (4th Cir.2002); *Kruman v. Christie's Int'l P.L.C.*, 284 F.3d 384, 399 n. 5 (2d Cir.2002); *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 428 (5th Cir.2001).

113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). Although jurisdiction was conceded by both parties in that case and the Court was only interested in issues of comity,[3] it engaged in a significant discussion of the FTAIA's import:

> Under § 402 of the Federal Trade Antitrust Improvements Act of 1982 (FTAIA), 96 Stat. 1246, 15 U.S.C. § 6a, the Sherman Act does not apply to conduct involving foreign trade or commerce, other than import trade or import commerce, unless "such conduct has a direct, substantial, and reasonably foreseeable effect" on domestic or import commerce. § 6a(1)(A).

*Hartford Fire*, 509 U.S. at 796 n. 23, 113 S.Ct. 2891.

In so stating the Court resolved any tension between the teachings of *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909) and *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945) (*Alcoa*). In *United States v. Nippon Paper Industries Co.*, 109 F.3d 1 (1st Cir.1997), the court explained:

> Any perceived tension between *American Banana* and *Alcoa* was eased by the Supreme Court's most recent exploration of the Sherman Act's extraterritorial reach. In *Hartford Fire* ... the Justices endorsed *Alcoa's* core holding, permitting civil antitrust claims under Section One to go forward despite the fact that the actions which allegedly violated Section One occurred entirely on British soil. While noting *American Banana's* initial disagreement with this proposition, the *Hartford Fire* Court deemed it "well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *Id.* at 796. The conduct alleged, a London-based conspiracy to alter the American insurance market, met that benchmark. *See id.*

109 F.3d at 3–4 (footnote omitted).

I now turn to the issue that divides this panel. Does "direct" in the phrase "direct, substantial, and reasonably foreseeable effect" reflect a statutory restriction of the operation of the Sherman Act, or does it merely codify existing case law?

### A.

For over a century, at least since 1898, the jurisprudence of antitrust law has required that for Section 1 of the 1890 Sherman Act to apply there must be a "direct effect" on interstate commerce. Congress' enactment of the FTAIA in 1982—promulgating the statutory language "direct, substantial, and reasonably foreseeable effect" on United States trade or commerce when foreign activity is involved—merely codified the direct effects requirement that has been set forth in teachings of (1) antitrust case law for over 100 years, (2) the *Restatement (Second) of Foreign Relations Law of the United States* (1965), (3) lead-

---

**3.** The opposite situation is presented here. The contested issue is subject matter jurisdiction, not comity. "[T]he general understanding [is] that the Sherman Act covers foreign conduct producing a substantial intended effect in the United States, and that concerns of comity come into play, if at all, only after a court has determined that the acts complained of are subject to Sherman Act jurisdiction." *Hartford Fire*, 509 U.S. at 797 n. 24, 113 S.Ct. 2891. Thus, the list of factors relating to moderating enforcement powers of the United States in the interest of comity set forth in *Timberlane Lumber Co. v. Bank of America, N.T. and S.A.*, 549 F.2d 597, 614 (9th Cir.1976), do not necessarily speak to the issue before us. Nor do my personal observations set forth in Ruggero J. Aldisert, "Federal Courts and Extraterritorial Antitrust Law: Enlightened Self Interest or Yankee Imperialism?," 5 *J.L. & Com.* 415 (1985).

ing treatises of distinguished academics, (4) the *Antitrust Guide for International Operations* of the United States Department of Justice, Antitrust Division, January 26, 1977 and (5) the *Report to Accompany Resolutions Concerning Legislative Proposals to Promote Export Trading* of the American Bar Association, Section of Antitrust Law, October 26, 1981.

We thus learn from the legislative history of the FTAIA:

> Following the lead of *Alcoa* and its subsequent judicial interpretations, the Department of Justice announced its view in 1977 that the United States antitrust laws should be applicable to an international transaction "when there is a substantial and foreseeable effect on the United States commerce," and that it would be a miscarriage of Congressional intent to apply the Sherman Act to "foreign activities which have no direct or intended effect on United States consumers or export opportunities...." United States Department of Justice, Antitrust Division, *Antitrust Guide to International Operations* 6–7 (1977)....
>
> An ABA Antitrust Section analysis has concluded that, despite the variations in wording, "there is, with rare exception, no *significant* inconsistency between judicial precedents and the Justice Department's view of the effects test." Antitrust Section Report at 10 (emphasis in original).

H.R.Rep. No. 97–686 at 5–6 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487, 2490–2491 (House Report).

The use of "direct effect" is historically an integral part of antitrust law. "As Professors Areeda and Turner have said, the federal courts have been invested 'with a jurisdiction to create and develop an "antitrust law" in the manner of the common law courts.' I Areeda & Turner, *Antitrust Law* ¶ 106, at 15 (1978)." *Nippon Paper,*

109 F.3d at 9 (Lynch, J. concurring). I first turn to the antitrust cases of the Supreme Court announcing or explicitly endorsing the "direct effects" test.

## B.

My starting point is the seminal cases in 1898. After some very broad language in *United States v. Trans–Missouri Freight Ass'n,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897), that would seem "to reach every minor restraint ... [t]he Court cut back the § 1 dragnet in *Hopkins [v. United States,* 171 U.S. 578, 19 S.Ct. 40, 43 L.Ed. 290, (1898)]. ..." 4 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1501, at 339 (2d ed.2000). The Court in *Hopkins* declared that the Sherman Act

> must have a reasonable construction, or else there would scarcely be an agreement or contract among business [persons] that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it.

171 U.S. at 600, 19 S.Ct. 40.

Earlier the same year the Court had held:

> An agreement entered into for the purpose of promoting the legitimate business of an individual or corporation, with no purpose to thereby affect or restrain interstate commerce, and which does *not directly* restrain s[u]ch commerce, is not ... covered by the act, although the agreement may indirectly and remotely affect that commerce.

*United States v. Joint–Traffic Ass'n,* 171 U.S. 505, 568, 19 S.Ct. 25, 43 L.Ed. 259 (1898) (emphasis added).

These clear statements by the Court enunciated the direct effects test in actions brought under Section 1 of the Sherman Act. In the words of the prominent commentators Areeda and Hovenkamp: "The

Court then excepted from the statute indirect or remote restraints." Areeda & Hovenkamp, *supra,* ¶ 1501, at 339.

Then in 1945 came Learned Hand's formulation in *Alcoa*: "the ingot fabricated by '*Alcoa,*' *necessarily had a direct effect* upon the ingot market." 148 F.2d at 424 (emphasis added). To say, as does the majority, that "[u]nlike the FTAIA, the *Alcoa* test does not require the effect to be "direct[,]"" (Maj. Op. at 679), runs counter to the explicit teachings of *Alcoa.* My view is endorsed by the authoritative commentators, Areeda and Hovenkamp:

> As Judge Hand made clear in his *Alcoa* opinion, the Sherman Act would govern the world unless significant/direct/intended effects were required, for American commerce is affected in some degree by every force affecting the world's markets in which we buy or sell. . . .

4 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 277 at 363 (2d ed.2000) (emphasis added).

The "direct effects" test has thus been part and parcel of antitrust law before and after the passage of FTAIA in 1982. Indeed it was an integral part of antitrust jurisprudence for at least 84 years before Congress used the word "direct" in its formula on what constitutes foreign conduct affecting United States commerce in the FTAIA. After over 100 years of antitrust cases, the Supreme Court has not diluted the "direct effects" requirement. On the contrary, in 1951 the Court approved the district court's use of this explicit test in a case, similar to the one at bar, in which there was a foreign restraint on commerce in the United States.

In *United States v. Timken Roller Bearing Co.,* 83 F.Supp. 284 (N.D.Ohio 1949), the district court had before it evidence that the defendant and two foreign manufacturers had made and sold for over 20 years a substantial portion of the world's production of anti-friction bearings by engaging in market allocation, price fixing and other illegal restraints of trade. As part of its defense, Timken argued that the cartel agreements had been made in foreign countries and that the Sherman Act could not be applied extraterritorially. In rejecting the argument the court held:

> Nor does the fact that the cartel agreements were made on foreign soil relieve defendant from responsibility. . . . They had a *direct* and influencing effect on trade in tapered bearings between the United States and foreign countries.

*Timken,* 83 F.Supp. at 309 (emphasis added, citation omitted). When the defendant repeated the same argument on appeal, the Court rejected its contention, stating: "[T]he trial judge after a patient hearing carefully analyzed the evidence in an opinion prepared with obvious care. Appellant's lengthy brief has failed to establish that there was error in making any crucial, or even important, ultimate or subsidiary finding." *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 597, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (footnote omitted).

That there is not a host of cases emphasizing this very point attests to the requirement that showing a direct effect on interstate commerce is a *sine qua non* of antitrust liability. Otherwise, as the Court stated, "there would scarcely be an agreement or contract among business [persons] that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it." *Hopkins,* 171 U.S. at 600, 19 S.Ct. 40.

### C.

In any event, the American Law Institute, composed of the leading judges, academics and lawyers, included the "direct effects" requirement in the relevant *Re-*

statement (Second) of Foreign Relations Law of the United States (1965) that was in effect at the time the Congress enacted the FTAIA in 1982.

Section 18, of the Restatement (Second) of Foreign Relations Law of the United States (1965) provided in relevant part:

A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if . . .

(b) (I) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial: (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems.

§ 18 (emphasis added).

In light of the foregoing, it cannot be said that in its 1982 enactment the Congress intended to promulgate a new standard for restricting the operation of the Sherman Act by using the language "direct, substantial, and reasonably foreseeable effect," when in fact the existing case law had been using the identical formulation, to wit, "(ii) the effect within its territory is substantial: (iii) it occurs as a direct and foreseeable result of the conduct outside the territory." Id. Indeed, the Court of Appeals for the Third Circuit cited Section 18 of the Restatement as reflecting the components of the "intended effects" test in extraterritorial Sherman Act cases. Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1292 (3d Cir.1979).

In 1986, when the bench, bar and professoriate promulgated the Restatement (Third) of Foreign Relations Law of the United States, the same formulation was retained, albeit in succinct form:

Whether exercise of jurisdiction over a person or activity is unreasonable is determined by evaluating all relevant factors, including, where appropriate:

(a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory.

§ 403(2) (emphasis added).

D.

The treatises on antitrust law also reiterate that the "direct effects" test was integral to antitrust law when Congress enacted the FTAIA.

In Volume 1 of James Atwood, Kingman Brewster & Spencer W. Waller, Antitrust and American Business Abroad (3d ed.2002), the commentators analyze leading antitrust cases preceding the 1982 Congressional action that discussed "direct and substantial effect upon trade" and " 'direct' effect on United States commerce." § 6, at 18 (quoting United States v. Gen. Elec. Co., 82 F.Supp. 753, 884 (D.N.J.1949) and Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F.Supp. 92, 103 (C.D.Cal.1971)).

In General Electric Co., District Judge Forman explained that "the second requirement for the finding of a violation on the part of Philips [is] that its activities must have had a direct and substantial effect upon trade. . . ." 82 F.Supp. at 891.

In Occidental Petroleum, the court set forth views of two leading commentators:

See Beausang, The Extraterritorial Jurisdiction of the Sherman Act, 70 Dick.L.Rev. 187, 191 (1966): "An '[e]ffect' is a necessary element of jurisdic-

*tion* \* \* \*; a direct and substantial '[e]ffect' is necessary for Sherman Act *violations*. The problem arises when the standards of illegality (which might be modified to promote foreign trade) are confused with the jurisdictional feature of the '[e]ffect on foreign commerce' " (emphasis in original).

In reviewing the cases, Von Kalinowski notes the confusion evident therein: "The cases that used the word "[e]ffect" have said that a restraint must (1) "directly affect," or (2) "substantially affect," or (3) "directly and substantially affect," or (4) simply "affect" the flow of foreign commerce. 1 J. Von Kalinowski, [Antitrust Laws and Trade Regulation] § 5.502[2], at 5–120 (footnotes omitted). He concludes that "[t]he better view would seem to be that any effect that is not both insubstantial and indirect will support federal jurisdiction under Section 1." *Id.* at 5–121–22.

331 F.Supp. at 102–103 (emphasis in original); *see also Todhunter–Mitchell & Co. v. Anheuser–Busch, Inc.*, 383 F.Supp. 586, 587 (E.D.Pa.1974) ("Restraints which directly affect the flow of foreign commerce into or out of this country are subject to the provisions of Section 1 of the Sherman Act. Von Kalinowski, *Antitrust Laws and Trade Regulations*, Vol. 1. § 5.02(2) (1971).").

Again turning to Areeda and Hovenkamp, the distinguished commentators jump into the new-law-versus-codification-of-the-old fray and persuasively argue that codification is the "better view":

The most interesting question about the new statute is whether its standard for appraising export restraints differs from that for appraising import restraints or whether it merely "codifies" a general understanding of when American antitrust law should be concerned about restraints abroad that might af-

fect United States interests only indirectly, insubstantially, or in ways that could not be foreseen. Although the "codification" reading would make the statute's distinction between import and export trade unnecessary, that distinction might simply reflect the new legislation's sole focus on export trade. In favor of the "codification" reading is *Alcoa* itself, which emphasized "significant" and "direct" effects on the United States, with intended effects as a possible alternative.

Also supporting that reading is the policy that conduct abroad whose primary effects are also abroad is not a fit subject for regulation by American domestic law. As Judge Hand made clear in his *Alcoa* opinion, the Sherman Act would govern the world unless significant/direct/intended effects were required, for American commerce is affected in some degree by every force affecting the world's markets in which we buy or sell....

If the new statute is not seen as a "codification" of the "better view" of the existing standard for jurisdiction, it might fail to have its intended effect even on export trade. It amends only the Sherman Act and the Federal Trade Commission Act, not the Clayton Act. Because some joint ventures can be reached under the latter statute, such a venture might be subjected to American antitrust law even though its effects would not satisfy the new statute.

Areeda & Hovenkamp, *supra*, ¶ 272, at 362–363 (footnotes omitted).

## E.

I now turn to the legislative history of the FTAIA for two distinct purposes. First, I emphasize that in formulating the expression specifically set forth in Section 18 of the *Restatement (Second) of Foreign*

*Relations Law of the United States* (1965), "such conduct has a direct, substantial, and reasonably foreseeable effect," Congress intended to voice its disagreement with some lower court decisions that did not require a "substantial" effect. My second purpose is to emphasize the conclusions sent to Congress by the United States Department of Justice and the American Bar Association, Section of Antitrust Law that "direct," "substantial" and "foreseeable" constituted a correct formulation of existing law.

What concerned Congress was twofold: first, that in some private actions a few *lower* courts seemed to discuss a *de minimus* effect, a much lesser standard than that of the "substantial effects" test;[4] and, second, to make explicit the requirement that the effect be "reasonably foreseeable" rather than based on "intent." House Report, *supra*, at 2494.

In this regard, what the House Report may have suggested as "new" law is what the Department of Justice reported to Congress as *existing* law:

> ... U.S. law in general, and the U.S. antitrust laws in particular, are not limited to transactions which take place within our borders. When foreign transactions have a substantial and foreseeable effect on U.S. commerce, they are subject to U.S. law regardless of where they take place.

Antitrust Division, *Antitrust Guide for International Operations* 6 (1977) (footnotes omitted).

The House Report acknowledged this view: "The Justice Department in its *Antitrust Guide* takes the position that only 'foreseeable' effects on U.S. commerce should result in U.S. antitrust jurisdiction." House Report, *supra*, at 2493.

Moreover, the American Bar Association Section of Antitrust Law submitted a report to Congress in October of 1981 commenting on the purpose and effect of the various pending legislative proposals on extraterritorial antitrust law. The ABA Antitrust Section concluded that "any business uncertainty as to the applicability of the antitrust laws to foreign trade would seem to be an overreaction, for there is, with rare exception, no *significant* inconsistency between judicial precedents and the Justice Department's view of the 'effects' test." American Bar Ass'n, Sec. of Antitrust Law, *Report to Accompany Resolutions Concerning Legislative Proposals to Promote Export Trading* 10 (1981) (emphasis in original). The *Antitrust Section Report* explained further:

> [I]t is clear ... that a showing of something more than any effect on United States interstate, export, or import commerce would be required to establish subject matter jurisdiction. In this fundamental respect, the recent court decisions seem essentially consistent with the Justice Department's enforcement policy and with the state of the law generally, although courts and commentators may not always see eye to eye on what constitutes "substantiality" or "foreseeability."

*Id.* at 13 (footnotes omitted). The ABA Antitrust Section, in a footnote, quoted another 1981 report it authored that states:

> The cases decided since *Alcoa* likewise recognize a need for limiting antitrust subject matter jurisdiction to something less than all conduct having any impact on American commerce. The approach generally taken ... has been to make jurisdiction dependent upon whether the effect on U.S. commerce in each case is

---

4. *See* cases cited in House Report, *supra*, at 2490.

*direct, substantial and reasonably fore-seeable.*

*Id.* (quoting American Bar Ass'n, Sec. of Antitrust Law, *U.S. Antitrust Law in International Patent and Know–How Licensing* 4–5 & nn. 16–18 (1981)) (emphasis added). It is from this conclusion that the *Antitrust Section Report* recommended to Congress the language "direct, substantial, and foreseeable effect"—to succinctly codify, for the purpose of clarification, existing antitrust case law.

When originally introduced in Congress, the FTAIA included only the words: "direct and substantial effect." H.R. 2326, 97th Cong. (1981). This indicates that the debate centered on the concept of foreseeability, not direct effects. But even then, the legislation as proposed did not reflect a change in existing case law, as the *Antitrust Section Report* explained: "H.R. 2326 [and its companion bill S. 795] is intended, *without changing the law substantively,* to use the 1977 Justice Department [Antitrust] Guide's wording to clarify the 'effects' test to be applied in foreign commerce cases." *Antitrust Section Report, supra,* at 29–30 (emphasis added) (citing Hearing on S. 795, 97th Cong. 4 (1981) (Statement of William F. Baxter, Esq.) ("We understand that this bill is not intended to work any significant changes in the law, but rather to restate current enforcement policy and judicial interpretations governing the applicability of the antitrust laws to joint export activity.")).

In commenting on the *Antitrust Section Report,* the House Report noted: "An ABA Antitrust Section analysis has concluded that, despite the variations in wording,'there is, with rare exception, no *significant* inconsistency between judicial precedents and the Justice Department's view of the effects test.' Antitrust Section Report at 10 (emphasis in the original)." House Report, *supra,* at 2490–2491.

## F.

In sum, the promulgation of the statutory language "direct, substantial, and reasonably foreseeable effect" on United States trade or commerce when foreign activity is involved was merely a codification of the direct effects requirement that had been set forth in teachings of ruling case law, the Restatements of Foreign Relations Law, leading treatises of distinguished academics, the Department of Justice's 1977 *Antitrust Guide* and the American Bar Association's 1981 *Antitrust Section Report.* Although the panel agrees on the standard to be applied, the "direct effects test," I respectfully disagree with the contrary view expressed by my colleagues of the majority that the word "direct" in the FTAIA is a new dimension of antitrust law. Whereas the majority interprets the term "direct" from scratch, I am guided by contemporary definitions of the term as well as relevant precedent, including that which preexisted the FTAIA, and therefore I diverge from my colleagues' interpretation of the "direct effects test" as applied to this case.

## III.

The United States sufficiently alleged that the Restrictive Clause has a "direct" effect on United States commerce under the most useful and sensible interpretation of that term. The district court did not attempt to define direct, but instead simply accepted LSL's argument that the effect of the Restrictive Clause was not direct because the clause "involves the development of seeds, not tomatoes." This ruling was simply wrong.

It was as if to say that restricting vanadium ore, which was processed into vanadium oxide in Canada and then into ferrovanadium, had no direct effect in the United

States markets, whereas here it was purchased by American steel companies for use as an alloy in hardening steels. *See Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). Likewise, we could not say that restricting sisal, the fiber of the henequen plant that is native to Mexico, had no effect on American commerce, because here the fabricated Mexican hemp amounted to more than 80 percent of the binder twine used for harvesting grain in the United States. *See United States v. Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927). Neither could we say that restricting competition for the purchase of cattle was insufficient to support an intention to monopolize commerce in fresh meat. *See Swift Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905).

"Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (quoting *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)). "Direct" has many meanings, in fact, only one of which is drawing direct lines on paper or geographically "from point to point without deviation"—the definition used by the district court and accepted by the Majority. The same dictionary source contains seven main meanings in the adjective form, encompassing 31 more specific subsidiary meanings. *Webster's Third New International Dictionary* 640 (1981). All of those meanings are contemporary with the FTAIA, enacted in 1982, and many are both ordinary and common.

It would be arbitrary simply to pick one definition and declare it the "plain meaning" in the abstract. Determining the meaning of "direct" requires the consideration of definitions as informed by the FTAIA's context and history. In this light, I believe that the most pertinent and sensible definition of "direct" for current purposes is: "3a. characterized by or giving evidence of a close especially logical, causal, or consequential relationship." *Id.*

And, if we go to the granddaddy of all English dictionaries, *The Oxford Dictionary of the English Language,* the straight line definition is described as an adjective arising in LME (Late Middle English, 1350–1460). But the definition which I perceive to be most relevant here is "c. LOGIC. Proceeding immediately from consequent to antecedent, from cause to effect. Etc. 'E19'" (1800–1829). This comports with the dictionary definition urged by the United States before us, in its neat comparison with the law of torts' familiar phrase "proximate cause."

Just as well, this is how the Supreme Court interpreted the term "direct" in the Foreign Sovereign Immunities Act (FSIA), as the majority concedes: "an effect is 'direct' 'if it follows as an *immediate consequence* of the defendant's activity.'" Maj. Op. at 680 (emphasis added) (quoting *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (holding that Argentina's bond payment rescheduling had a "direct effect" in the United States, where Argentina was to perform its ultimate contractual obligations, even though the bond holders were foreign corporations)).[5]

---

**5.** The majority points out that the Court in *Weltover* "reject[ed] the suggestion that ['direct'] contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" 504

U.S. at 618, 112 S.Ct. 2160. This simply indicates, however, that "direct" requires something less than substantial and foreseeable. *Id.* Indeed, a "direct" effect, or imme-

A definition of "direct" that focuses on consequential relationships draws support from another area of antitrust law—private plaintiffs' antitrust standing. In *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Court faced the issue of which persons sustained injuries too remote from an antitrust violation to give them standing to sue for damages under Section 4 of the Clayton Act. In answering this question, the Court observed that, historically, some antitrust cases formulated a test that equated "remoteness" with "directness" and suggested that both terms are analogous to the common law concept of "proximate cause." *Id.* at 478 nn. 12–13, 102 S.Ct. 2540.

To be sure, proximate cause itself is not easily defined. *Id.* at 478 n. 13, 102 S.Ct. 2540. But it is still useful and important here for two reasons. First, it rightly focuses the inquiry about the meaning of "direct" into a relationship of logical causation rather than of something else such as time or geography. Second, it is a reminder that public policy undergirds concepts such as "proximate cause" and "direct effects." The "policy unequivocally laid down by the [Sherman] Act is competition[,]" *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), and the FTAIA, which is part of the Sherman Act, should therefore be interpreted in light of its fundamental purpose to protect United States consumers from the consequences of anticompetitive conduct.

Indeed, even the master wordsmith Benjamin N. Cardozo had his fling with attempting to define "direct" in deciding what was required in the context of Congress' Commerce Clause power. He warned of confining a constitutional principle—namely the power of one sovereign to regulate the commerce of another—to a strict construction of a pair of opposing adjectives, for:

> 'the law is not indifferent to considerations of degree'.... Perhaps, if one group of adjectives is to be chosen in preference to another, 'intimate' and 'remote' will be found as good as any. At all events, 'direct' and 'indirect,' even if accepted as sufficient, must not be read too narrowly.... A survey of the [Commerce Clause] cases shows that the words have been interpreted with suppleness of adaptation and flexibility of meaning. The power is as broad as the need that evokes it.

*Carter v. Carter Coal Co.*, 298 U.S. 238, 327–328, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) (Cardozo, J., dissenting) (citations omitted). After reviewing relevant Commerce Clause cases Cardozo concluded:

> What the cases really mean is that the causal relation in such circumstances is so close and intimate and obvious as to permit it to be called direct without subjecting the word to an unfair or excessive strain.

*Id.* at 328, 56 S.Ct. 855.

When directness is seen as a synonym for proximate cause, it is relevant that there are two types of causation: causation in fact, otherwise known as "but for" causation; and legal causation, the public policy imperative of cutting off liability

diate consequence, on domestic commerce is the baseline—the *sine qua non*—of extraterritorial jurisdiction. Although the FSIA requires this baseline, the FTAIA requires that the immediate consequence be substantial and foreseeable. Here, the government sufficiently averred that the adverse effect on the United States' domestic commerce of tomatoes has been an immediate consequence of the Restrictive Clause governing tomato seeds, and given Defendants' "market power," this "direct effect" has been, as well, "reasonably foreseeable" and "substantial." *See* discussion *infra*.

when a causal chain of events becomes excessively complex or attenuated. *See, e.g., Prosser and Keeton on Torts* § 42, at 272–73 (5th ed.1984). It is evident here that the United States sufficiently alleged that the Restrictive Clause had a "direct," or proximate cause, effect on United States commerce in both senses.

First, the Complaint squarely alleged causation in fact: but for the restraint, United States consumers would have the important potential of better winter tomatoes grown from Hazera seeds. The Restrictive Clause, and indeed the entire LSL–Hazera relationship, was aimed at United States consumers. The United States tomato market drives the long shelf-life seed business. LSL sells its tomato seeds to farmers in Mexico and those farmers raise the seeds into tomatoes for the purpose of supplying grocery stores in the United States. Consumers in the United States are the persons injured by the Restrictive Clause, as they are the ones deprived of the superior tomatoes that competition from Hazera could bring.

Second, the causal link between seeds and tomatoes is very close and intimate. If seeds are allowed to grow (and otherwise they would be worthless), they quickly and inevitably become tomatoes. Because the principal use of tomato seeds is to grow tomatoes, tomatoes are more properly described as a different stage of the *same* product rather than as a related but downstream product. The seed, when planted, becomes the plant and the fruit that is yielded. Accordingly, LSL's contention, adopted by the district court, that the seed is only an input into the finished tomato, does not preclude a "direct" effect on United States consumers.

Moreover, the causal connection between the Restrictive Clause and its effect on United States consumers is extremely close and intimate. The United States alleged a restraint on the very tomato seeds that grow into tomatoes in Mexico expressly for shipment to the United States. The consequences to the commerce of tomatoes in the United States are immediate, as there are no diversions or other intermediate stops for either the seeds or the resulting tomatoes. Short of a restraint on import commerce (to which the FTAIA does not apply), it is difficult to imagine foreign conduct that would have a more direct effect on United States commerce.

Most obviously, in *Hartford Fire* the Supreme Court treated the plaintiffs' allegations as satisfying *both* the common law and the FTAIA's tests for subject matter jurisdiction as to a conspiracy involving the market for *reinsurance,* particularly in London, but ultimately targeting the United States domestic market for *primary* insurance. 509 U.S. at 795–796, 113 S.Ct. 2891. The two products, the London-based reinsurance and the United States primary insurance, were closely related— in a proximate cause sense—because primary insurers depend on reinsurance for their own protection and "the London reinsurance market [is] an important provider of reinsurance for North American risks." *Id.* at 775, 113 S.Ct. 2891.

The district court's distinction between seeds and tomatoes, endorsed by the majority, is fundamentally inconsistent with *Hartford Fire*. If a restraint on reinsurance in the United Kingdom has a sufficiently "direct" effect on primary insurance in the United States under the FTAIA, it is impossible to see how a restraint on tomato seeds in Mexico does not have an equally direct effect on the resulting tomatoes in the United States—particularly when the district court's order concedes that seeds and tomatoes are related and it is undisputed that Mexico is a signif-

icant provider of winter tomatoes for the United States.[6]

The United States alleged here that a contractual bar against Hazera selling seeds in Mexico adversely affected the domestic commerce of tomatoes, the inevitable outgrowth of the seeds, in the United States. *Hartford Fire* shows that the FTAIA is satisfied by these facts, and the district court's treatment of the distinction between seeds and tomatoes as dispositive was therefore error. Fundamentally, the district court confused *conduct* with *effect* under the FTAIA by focusing on what the Restrictive Clause bars—Hazera selling seeds in Mexico—and ignoring the effect of that conduct, which is to deprive United States consumers of winter tomatoes from Hazera seeds. But "it is the effect and not the location of the conduct that determines whether the antitrust laws apply," even under the FTAIA. *Kruman v. Christie's*

*Intern. PLC*, 284 F.3d 384, 395 (2d Cir. 2002).

In as much as the Congress did not define the term "direct" by statute, this court should give the term its ordinary meaning within the context of Congress' Commerce Clause power. In the words of Cardozo, the "causal relation" between the restraints on the development and production of tomato seeds in Mexico and the marketing, price and consumption of the resulting tomatoes in the United States "is so close and intimate and obvious as to permit it to be called direct without subjecting the word to an unfair or excessive strain." *Carter*, 298 U.S. at 328, 56 S.Ct. 855.

Accordingly, I am convinced that there is no persuasive reason why a restraint on selling seeds in Mexico cannot have a "direct" effect on United States domestic commerce in tomatoes.[7]

6. The majority emphasizes that Hazera has not yet developed its own long term shelf-life tomato seeds and suggests that the Restrictive Clause cannot have a direct effect on United States commerce because the prospect of Hazera developing such a seed without infringing on LSL's patent is speculative. (*See* Maj. Op. at 681 n. 7). All of this flies in the face of the government's declarations in its Complaint that: (1) Hazera is one of the world's leading tomato seed producing companies, (2) Hazera sells more seeds than any other company in many important tomato producing countries, including Spain, Italy, Israel and Turkey, (3) For the European and Mediterranean regions, Hazera has bred long shelf-life tomatoes by traditional plant-breeding processes that do not incorporate the RIN gene (and accordingly do not implicate LSL's patent rights), (4) Hazera is one of the few firms with experience and know-how to develop seeds that will allow farmers from the United States and Mexico to grow better fresh market tomatoes for United States consumers during winter months, (E.R. at 11–12, ¶¶ 37, 39), and but for the Restrictive Clause, Hazera would be a significant competitor to Appellees in North America. Indeed, LSL would have had little reason to impose the

Restrictive Clause on Hazera if it believed that Hazera's prospect in developing its own long term shelf-life tomato seed was "speculative at best," as the majority suggests. Hazera cannot be faulted for not producing seeds in Mexico or the United States, as it has done elsewhere, because the Restrictive Clause prohibits it from doing so.

7. The majority argues that an agreement with farmers in Mexico to set a floor on prices of tomatoes shipped from Mexico to the United States supports its position. *Suspension of Antidumping Investigation: Fresh Tomatoes From Mexico*, 67 Fed.Reg. 77044–02 (Dec. 16, 2002). The agreement covers all "fresh or chilled tomatoes (fresh tomatoes) which have Mexico as their origin...." *Id.* at 77046. The agreement fixes minimum prices that tomato growers in Mexico must charge for their product. *Id.* at 77045–77050. The majority argues that this agreement, and the concerns that gave rise to it, belie the United States' argument that LSL could raise the prices ultimately paid by American tomato consumers. I disagree, and endorse completely the United States' reply to this argument:

First, as the United States argued in its briefs, the primary effect of the Restrictive

Although the district court determined there was no subject matter jurisdiction, it went further in its analysis and decided that the United States' Complaint failed to state a claim for which relief can be granted. Rule 12(b)6, Federal Rules of Civil Procedure. In so doing the court participated in an exercise of determining the relevant market definition for antitrust law, and accordingly stepped beyond its bounds,"[f]or a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

Moreover, the court erred in its treatment of the two components of defining a market in antitrust law: first, identifying the relevant product for the service market, and, second, identifying the relevant geographic area. It is to this issue that I will now turn. The majority held that there was no subject matter jurisdiction and, following the teachings of *Steel Company*, it properly declined to address the Rule 12(b)(6) issue: "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." 523 U.S. at 94, 118 S.Ct. 1003 (quoting *Ex Parte McCardle*, 7 Wall. 506, 514, 19 L.Ed. 264 (1868)). Because I conclude that there is subject matter jurisdiction, and the district court elected to decide the merits, so must I.

## IV.

First, it is of import to provide a brief overview of market power, an underlying principle of antitrust law. Section 1 of the Sherman Act reads in part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (1994).

Antitrust is concerned with the power of market participants to distort the competitive process. This distortion can misallocate resources, transfer wealth from consumers and other protected groups or, as in this case, by means of the non-compete agreement, stifle new entry or innovation and commercialization.

The power relevant to antitrust is market power, or as some economists put it "monopoly power."[8] This power is, at its core, linked to elasticity of demand. Although a participant can exercise market power either as a seller or as a buyer, it is usually defined from the point of view of the seller: *Market power is the seller's ability to raise and sustain a price increase without losing so many sales that it must rescind the increase.* William M. Landes & Richard A. Posner, "Market Power in

---

Clause on U.S. commerce is to limit innovation that improves tomato quality. The Restrictive Clause excludes Hazera's current and future long shelf-life seeds from North America and thereby ensures that no tomatoes grown from those seeds can reach U.S. grocery stores. The official anti-dumping agreement cited by LSL has nothing to do with this effect.

Second, the very existence of the anti-dumping agreements confirms that the importation of fresh tomatoes from Mexico, and the pricing of those tomatoes, have a substantial effect on U.S. domestic commerce. But it is impossible to determine, at least at this stage of the proceedings, whether the agreement prevents the Restrictive Clause from affecting prices in the United States.

**8.** Frederic M. Sherer and David Ross, *Industrial Market Structure and Economic Performance* 17 (3d ed.1990).

Antitrust Cases," 94 *Harv. L.Rev.* 937, 939 (1981).[9]

Elasticity of demand is a concept used to signify the relationship between changes in price and responsive changes in demand. In monopolization cases, the Court has said that the existence of market power can be determined by examining elasticities. *United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 400, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) ("[t]he responsiveness of the sales of one product to price changes of the other").

### V.

Under the rule of reason, or a market analysis of the circumstances presented in this case, the United States satisfied pleading requirements to withstand a motion to dismiss for failure to state an antitrust claim.

"Ordinarily, whether particular concerted activity violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason—that is, 'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'" *Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (quoting *Cont'l T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). "Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation." *Id.* "Such agreements are those that always or almost always tend to restrict competition and decrease output." *United States v. Brown,* 936 F.2d 1042, 1045 (9th Cir.1991) (internal quotations and citations omitted). In general, "[a] market allocation agreement between competitors at the same market level is a classic *per se* antitrust violation." *Id.*

Given the binding precedent of this court, however, the United States may not rely on a *per se* theory of a Sherman Act violation in this case. *Metro Indus., Inc. v. Sammi Corp.,* 82 F.3d 839, 844–845 (9th Cir.1996) ("application of the per se rule is not appropriate where the conduct in question occurred in another country").[10] Instead, we must examine whether there are

**9.** Judge Posner has restated this definition in various opinions. *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 603 (7th Cir.1997) (market power or monopoly power is "the power to raise price above cost without losing so many sales as to make the price rise unsustainable") *cert. denied,* 522 U.S. 1153, 118 S.Ct. 1178, 140 L.Ed.2d 186 (1998); *Olympia Equip. Leasing Co. v. Western Union Tel. Co.,* 797 F.2d 370, 373 (7th Cir.1986) (market power is "the power to raise prices without losing so much business that the price increase is unprofitable"), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742, 745 (7th Cir.1982) (market power is the "power to raise prices significantly above the competitive level without losing all of one's business").

**10.** This is not to say that I personally agree with this holding, but it nevertheless binds this panel in this judicial circuit. Like the United States, I am concerned that it runs counter to teachings of the Supreme Court that long ago held that international conduct such as price fixing and territorial allocations among horizontal competitors is *per se* unreasonable and hence *per se* unlawful under Section 1 of the Sherman Act. *Timken,* 341 U.S. at 599, 71 S.Ct. 971, *aff'g Timken,* 83 F.Supp. 284, 310 (N.D.Ohio.1949) ("In view of settled law and the facts, defendants' contention that the restraints were reasonable must be rejected as untenable. The restraints on commerce, here proved by abundant evidence, have been denounced as unreasonable per se."); *see also Nippon,* 109 F.3d at 7 ("[t]he instant case falls within [the per se illegal] rubric") and Areeda & Hovenkamp, *supra,* ¶ 273, at 379 (1997).

intended and substantial effects in the United States-an inquiry that must be conducted through a market analysis and the rule of reason.[11]

### A.

"We review *de novo* the district court's order of dismissal for failure to state a claim." *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 984 (9th Cir. 2000). "A motion to dismiss for failure to state a claim may not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Both the district court and this Court are required to "presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the non-moving party." *Id.* (citation omitted).

Here the district court ignored the Complaint's unanswered allegation that the Restrictive Clause is a horizontal non-compete agreement that amounts to a "naked restraint of trade." This was reversible error.

The district court demanded a level of detail at the pleading stage that the Federal Rules do not require in antitrust cases involving conduct subject to the rule of reason. "The complaint need not set out the facts in detail; what is required is a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* at 984 (quoting Rule 8(a), Federal Rules of Civil Procedure). "[N]otice pleading is all that is required for a valid

antitrust complaint[,]" and thus "the complaint need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp.,* 711 F.2d 989, 995 (11th Cir.1983) (quoting *Conley,* 355 U.S. at 47, 78 S.Ct. 99), *accord Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 924 (9th Cir.1980) ("There is no special rule requiring more factual specificity in antitrust pleadings.").

Moreover, in recent decisions the Supreme Court has been extremely emphatic on this issue. In *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the Court made clear that "Rule 8(a)'s simplified pleading standard applies to *all civil actions,* with limited exceptions. Rule 9(b), for example, provides for greater particularity in all averments of fraud or mistake." *Id.* at 513, 122 S.Ct. 992 (emphasis added).

In so proclaiming, the Court reaffirmed the teachings of *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993):

> Rule 8(a)(2) requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Conley* ... we said in effect that the Rule meant what it said:
>
>> [T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain

---

11. The district court treated the domestic affairs of LSL as the backdrop of facts upon which to assess the 12(b)(6) motion and used the foreign affairs as the backdrop for the 12(b)(1) motion. I agree with the majority that this analysis improperly divided a course of conduct that is interrelated and comprised

of an impetus in a foreign location and an alleged direct effects in a domestic one. The entire course of conduct must be analyzed to determine its effects and this can only be done with the rule of reason. A division of activities into domestic and foreign categories was improper.

statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests.

[355 U.S.] at 47, 78 S.Ct. 99 ... (footnote omitted).

*Id.* at 168, 113 S.Ct. 1160.

What the United States averred in its Complaint was all that is necessary under the teachings of *Swierkiewicz* and *Leatherman.* "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. 992 (quoting *Conley,* 355 U.S. at 47, 78 S.Ct. 99). The United States alleged that the Restrictive Clause, which "bars Hazera from ever competing to develop tomato seeds specifically adapted for North American climates," violates the Sherman Act because it was so "overbroad as to scope and unlimited as to time as to constitute a naked restraint of trade...." The Complaint specified, in a short and plain statement, that "[t]he relevant market consists of seeds designed to grow fresh-market tomatoes in North America during the winter months." [12]

These averments gave the defendants notice that the government's Sherman Act claim would focus on the Restrictive Clause's effect on competition with respect to (1) seeds designed to grow fresh-market tomatoes (thus excluding tomatoes destined for processing), (2) tomatoes grown in North America (thus including both the United States and Mexico), and (3) tomatoes that are grown in the winter months. The United States' Complaint was more

than sufficient to put the defendants on fair notice of the claim and relevant market and enable them to frame responsive pleadings. *See, e.g., Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1086 (D.C.Cir.1998) (alleged "market for English-language radio broadcast advertising in the Eastern Caribbean" was sufficient); *Quality Foods,* 711 F.2d at 996 ("United States market for frozen vegetables" was sufficient). The district court erred in finding fault with the product and geographical dimensions of the relevant market as set forth in the government's complaint.

B.

The court based its finding of fault with the product component of the relevant market on a premise of overbreadth: "by including seeds designed to grow in greenhouses, cherry tomato seeds, open-field seeds and seeds with long-shelf-life qualities," the Complaint's market included "different types of seeds [that] are not interchangeable."

By asserting that these seeds are not interchangeable, an assertion not made by LSL or Seminis, the court in effect participated in its own fact finding. The nature of Rule 12(b)(6) does not allow courts to reach "matters outside the pleading" without following the summary judgment procedures of Rule 56. *San Pedro Hotel Co., Inc. v. City of Los Angeles,* 159 F.3d 470, 477 (9th Cir.1998). ("[i]f matters outside the pleadings are considered, the motion to dismiss is to be treated as one for sum-

---

**12.** Defendants do not deny that they have market power in the market for "seeds designed to grow fresh-market tomatoes in North America during the winter months," or in any part thereof. In particular, they do not deny the Complaint's allegation that they control a 70+% share of the relevant market, which must be taken as correct for Rule

12(b)(6) purposes. Rather, they appear to deny market power in a market of their own definition, not alleged by the United States— "the sale of long-shelf life tomato seeds for open-field cultivation in winter in the United States"—a market in which they insist there is no commerce. (LSL Br. at 15–17).

mary judgment").[13] The district court here did not invoke Rule 56 procedures, and was thus precluded from relying on matters outside the four corners of the United States' Complaint. Moreover, the court may not make fact findings of a controverted matter when ruling on a Rule 12(b)(6) motion. *Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir.1987).

Even if the court's unsupported supposition of overbreadth as to the product market definition was correct, the competitive analysis of the case would not change.[14] The Restrictive Clause, as interpreted by LSL, excludes Hazera from developing, marketing, or selling *any* kind of tomato seed that has *any* long shelf-life qualities, whether referred to as greenhouse, open-field, long shelf-life, extended shelf-life, or something else. The analysis would thus be the same in the smaller markets that the district court suggested as preferable. Aggregating these various tomato seed products was a reasonable convenience, and it certainly does not foreclose the United States' case.

But the court's error did not stop there. It committed reversible error also in finding fault with the geographical metes and bounds of the relevant market.

## C.

As to the geographic scope of the relevant market, the crux of the district court's objection to the Complaint was also premised on overbreadth, as it reasoned: "open field winter tomatoes can only potentially be grown in Mexico and some Southern U.S. States" rather than throughout North America. The district court's approach misapprehends antitrust law dealing with the geographic market definition.

If Hazera was excluded with respect to all of North America, it necessarily was excluded with respect to Mexico and the southern U.S. States. And if all the relevant tomatoes were grown in those areas, then a market consisting of those areas would be equivalent, for purposes of this case, to a market encompassing all of North America, because it would include precisely the same tomatoes.

In any event, neither the district court nor the Appellees have cited any case that dismissed a complaint because of an allegedly *overbroad* market definition. The cases cited were dismissals in which the market was defined too narrowly. My own research has not unearthed any authority supporting the district court's decision in this respect.[15]

**13.** When a district court rules on a Rule 12(b)(1) motion, unlike a 12(b)(6) motion, it may consider affidavits or other extra-pleading evidence. *St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir.1989).

**14.** *Tanaka v. University of Southern California,* 252 F.3d 1059 (9th Cir.2001), on which the district court relied, differs from this case with respect to the sufficiency of the plaintiff's market, and anticompetitive effects allegations. In that case a former collegiate soccer player challenged an intercollegiate athletic association rule that discouraged her from an intraconference transfer to a single athletic program, but she apparently did not even attempt to allege geographic or product markets on the basis of any economic facts. In-

stead, she based her allegations simply on her own subjective personal preferences: she alleged that "the relevant [geographic] market is Los Angeles because she wanted to be close to her family," *id.* at 1063 (internal quotations and brackets omitted), and that the relevant product market was UCLA because of her "strictly personal preference" that she wanted to play for UCLA's soccer team. *Id.* These market allegations were obviously defective, and Tanaka "failed to allege that the transfer rule has had significant anticompetitive effects within a relevant market, however defined." *Id.* at 1064.

**15.** Rather, this case resembles one Justice Holmes described concerning the product and geographic scope of a domestic meat

In a footnote, the court went further, reasoning that because tomato seeds are designed for microclimates, "[i]t seems to the Court that separate relevant markets exist for each growing region that requires a distinct seed variety." But Hazera was excluded from each of the court's suggested microclimate markets, and its exclusion from each eliminated a potent force for enhanced competition. Because the likely anticompetitive effect of the Restrictive Clause was basically the same for all the relevant microclimate markets, treating them as a single aggregate market cannot be a valid basis for dismissing the United States' Complaint.

In addition, the district court erred in holding that every microclimate for different tomato seeds is a separate market. This approach assumes, without logical underpinning or case law support, that any substitution had to occur at the level of the farmer when selecting seeds. The Complaint placed seeds for different microclimates in the same market because the tomatoes grown in the different microclimates compete at the level of grocery store shelves. It is the grocery store-level competition of tomatoes, not the farmers' selection of seeds with which to grow them, that goes to the heart of the United States' Complaint and constitutes the geographic contours of the market.

\*     \*     \*     \*     \*     \*

For all the foregoing reasons I would reverse the judgment of the district court

that determined that there was no subject matter jurisdiction under Rule 12(b)(1) and that the Complaint failed to state a claim for which relief could be granted under Rule 12(b)(6).

With respect, I dissent.

packing monopoly in 1905: "The scheme alleged is so vast that it presents a new problem in pleading.... Its size makes the violation of the law more conspicuous, and yet the same thing makes it impossible to fasten the principal fact to a certain time and place." *Swift & Co. v. United States*, 196 U.S. 375, 395, 25 S.Ct. 276, 49 L.Ed. 518 (1905). Like Justice Holmes, I conclude here that

the scheme as a whole seems to ... be within the reach of the law. The constitu-

ent elements ... are enough to give the scheme a body and, for all that we can say, to accomplish it.... Although the combination alleged embraces restraint and monopoly of trade within a single State, its effect upon commerce among the States is not accidental, secondary, remote, or merely probable ....

*Id.* at 396–397, 25 S.Ct. 276.