**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SEAGATE TECHNOLOGY LLC;
SEAGATE TECHNOLOGY
(THAILAND) LTD.; SEAGATE
SINGAPORE INTERNATIONAL
HEADQUARTERS PTE, LTD;
SEAGATE TECHNOLOGY
INTERNATIONAL,

  *Plaintiffs - Appellants*,

v.

NHK SPRING CO., LTD.; NHK
INTERNATIONAL
CORPORATION; NHK SPRING
(THAILAND) CO., LTD.; NAT
PERIPHERAL (DONG GUAN) CO.,
LTD.; NAT PERIPHERAL (H.K.)
CO., LTD.,

  *Defendants - Appellees*.

No. 24-4470

D.C. No.
3:19-md-02918-
MMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted June 6, 2025
San Francisco, California

Filed January 8, 2026

Before: Consuelo M. Callahan and Kenneth K. Lee, Circuit
Judges, and Scott H. Rash, District Judge.[*]

Opinion by Judge Lee

## SUMMARY[**]

### Antitrust

The panel vacated the district court's partial summary
judgment in favor of defendants NHK Spring Co., Ltd., et al.
and remanded for further proceedings in an antitrust action
brought under the Sherman Act by Seagate Technology
LLC, an American company, and two Seagate foreign
entities.

The Seagate plaintiffs sought to bring antitrust claims
against Japanese-owned NHK for unlawful price-fixing. In
a separate federal criminal proceeding, NHK pleaded guilty
to conspiring with its competitors to fix the price of
suspension assemblies sold in the United States and
elsewhere in the world. Seagate's foreign entities bought

---

[*] The Honorable Scott H. Rash, United States District Judge for the
District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

those price-fixed suspension assemblies, which were incorporated into Seagate's hard drives, outside the United States. The district court ruled that the Sherman Act did not extend to such foreign injury.

The panel held that Seagate alleged a viable theory of extraterritorial reach under the Foreign Trade Antitrust Improvements Act, which provides that U.S. antitrust laws can apply, even if an injury occurs beyond U.S. borders, if the anticompetitive conduct (1) involves goods imported into the United States that Americans buy (the "import commerce" exclusion) or (2) has a direct effect on domestic commerce that in turn causes the foreign antitrust injury to the plaintiff (the "domestic effects" exception). The panel held that the import commerce exclusion did not apply because the suspension assemblies were not directly imported into the U.S. But under the domestic effects exception, Seagate sufficiently alleged that NHK's price-fixing in the U.S., as reflected in a master product supply agreement negotiated in the U.S., led to the domestic harm of higher prices for the suspension assemblies in the U.S., and that effect also directly caused an antitrust injury abroad because Seagate's foreign entities overpaid for the suspension assemblies based on the inflated U.S. price.

The panel remanded to the district court to determine whether Seagate adduced sufficient evidence of proximate cause to survive summary judgment.

# COUNSEL

Eamon P. Joyce (argued), Sidley Austin LLP, New York, New York; David R. Carpenter and Nicole M. Baade, Sidley Austin LLP, Los Angeles, California; Jeremy Rozansky, Sidley Austin LLP, Washington, D.C.; Robert N. Hochman and Shirin Mahkamova, Sidley Austin LLP, Chicago, Illinois; Steffen N. Johnson and John B. Kenney, Wilson Sonsini Goodrich & Rosati, Washington, D.C.; Mikaela E. Evans-Aziz, Kenneth R. O'Rourke, and Jeff VanHooreweghe, Wilson Sonsini Goodrich & Rosati, San Francisco, California; Michael W. McConnell, Wilson Sonsini Goodrich & Rosati, Palo Alto, California; for Plaintiffs-Appellants.

Michael F. Murray (argued), Craig Y. Lee, Carter C. Simpson, and Alexandra Glazer, Paul Hastings LLP, Washington, D.C.; Navi S. Dhillon, Paul Hastings LLP, San Francisco, California; for Defendants-Appellees.

Aaron D. Van Oort, Kevin P. Wagner, and Kirsten L. Elfstrand, Faegre Drinker Biddle & Reath LLP, Minneapolis, Minnesota; Paul J. Riehle, Faegre Drinker Biddle & Reath LLP, San Francisco, California; for Amicus Curiae Professor Kenneth G. Elzinga.

Kathleen W. Bradish and Randy Stutz, American Antitrust Institute, Washington, D.C., for Amicus Curiae American Antitrust Institute.

Jennifer L. Williams and Megan A. Maitia, Summa LLP, Los Angeles, California, for Amicus Curiae Professor Cedric Ryngaert.

# OPINION

LEE, Circuit Judge:

American antitrust laws broadly prohibit anticompetitive conduct and authorize private parties to seek treble damages. Congress, however, largely closed our courthouse doors to antitrust claims based on injuries outside the United States. But it carved out two narrow exceptions under the Foreign Trade Antitrust Improvements Act (FTAIA).  15 U.S.C. § 6a.  U.S. antitrust laws can still apply—even if the injury occurs beyond our borders—if the anticompetitive conduct (1) involves goods imported into the United States that Americans buy (the "import commerce" exclusion) or (2) has a direct effect on domestic commerce that in turn causes the foreign antitrust injury to the plaintiff (the "domestic effects" exception).

In an increasingly globalized economy, it can sometimes be thorny, as in this case, to tease out when these narrow statutory provisions allow extraterritorial reach of our antitrust laws.  Seagate Technology LLC (an American company based in California) and two Seagate foreign entities (Seagate Thailand and Seagate Singapore) argue that they can bring antitrust claims against Japanese-owned NHK Spring Co., Ltd. for unlawful price-fixing.  In a separate federal criminal proceeding, NHK pleaded guilty to conspiring with its competitors to fix the price of "suspension assemblies" sold in the United States and elsewhere in the world.  But Seagate's foreign entities bought those price-fixed suspension assemblies—which are incorporated into Seagate's hard drives—outside the United States.  The district court thus granted partial summary

judgment for NHK, ruling that the Sherman Act did not extend to such foreign injury.

We vacate the district court's order because Seagate[1] has alleged a viable theory of extraterritorial reach under the FTAIA. According to Seagate's complaint, NHK's price-fixing scheme was reflected in a master product supply agreement negotiated in the United States with Seagate Technology LLC. That agreement reflected an artificially high price for suspension assemblies. Then this NHK-Seagate Technology LLC agreement in turn allegedly set the pricing parameters for Seagate's foreign entities because they were obligated to accept those (fixed) prices in the agreement. Put another way, NHK's price-fixing in the U.S. led to domestic harm (*i.e.*, higher prices for the suspension assemblies in the United States), and that effect also directly caused an antitrust injury abroad (because Seagate's foreign entities overpaid for the suspension assemblies based on the inflated U.S. price). We, however, remand for the district court to determine whether Seagate has adduced sufficient evidence of proximate cause to survive summary judgment.

## BACKGROUND

### I.  Factual Background

### A. Seagate foreign entities buy SAs from NHK and other suppliers.

Nearly every consumer electronic device needs a way to store data. Many devices—such as computers, gaming consoles, and servers—rely on hard disk drives (HDDs) for

---

[1] We will use the term "Seagate" to refer to Seagate Technology LLC, Seagate Thailand, and Seagate Singapore collectively. But we will refer to each Seagate entity by its individual name if that distinction is relevant to our discussion.

bulk storage. Hard disk drives resemble electro-magnetic "filing cabinets" containing several drawers (or "platters") with millions of folders (or "sectors") storing electronic data.

Seagate Technology LLC, a California-based company, is a leading manufacturer of hard disk drives. But Seagate Technology LLC does not produce all the key components that go into a hard disk drive, including a part called the "suspension assembly" (sometimes called "SA"). Each platter in a hard drive constantly spins to allow the user to access all the data sectors on that platter. A suspension assembly holds a recording head 12 nanometers above a platter turning at 150–170 miles per hour, requiring precision like "a 747 aircraft flying full speed l/l6th of an inch above a [jagged] desert surface."

Reflecting the global nature of commerce today, a Seagate hard disk drive is built with parts bought and assembled across the world by various Seagate foreign entities. Most of Seagate's suspension assemblies are bought in Thailand by the Thai entity, Seagate Technology (Thailand) Ltd ("Seagate Thailand"). There, the suspension assemblies are incorporated into another part called a head gimbal assembly. Next, Seagate incorporates the head gimbal assembly into yet another part called a head stack assembly either in Thailand or China. The head stack assemblies are then incorporated into finished hard disk drives in Thailand, China, or Singapore, and all the hard disk drives are shipped to Seagate Singapore International Headquarters Pte. Ltd. ("Seagate Singapore") for distribution. Seagate Singapore either sells the hard disk drives directly or distributes them to other Seagate entities to sell, such as Seagate Technology LLC in California. In other

words, only the finished hard disk drives are directly imported into the United States.[2]

Seagate buys its suspension assemblies from a few suppliers. Since the 1980s, the suspension assembly manufacturing industry has consolidated greatly and only two main players remain. One of those is NHK Spring Co., Ltd., a leading Japanese manufacturer of springs and other engineered components like suspension assemblies. During the relevant period, NHK often received "the majority of the Seagate business" for suspension assembly projects, despite being the highest-priced bidder on Seagate's proposals.

### B. NHK rigs suspension assembly prices based on a U.S. agreement.

In July 2019, NHK pleaded guilty to criminal price-fixing under the Sherman Antitrust Act, 15 U.S.C. § 1. From before June 2008 to at least April 2016, NHK engaged in a global conspiracy with another competitor to fix the price of suspension assemblies in the United States and elsewhere. NHK's officers and employees held meetings with another competitor in which they agreed "to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for[] HDD suspension assemblies." As part of NHK's plea agreement, the U.S. Department of Justice sought a criminal fine of $28.5 million dollars, which was approved by the U.S. District Court for the Eastern District of Michigan. But the government did not seek restitution "in light of the availability of civil causes of action." *See United States v. NHK Spring Co. Ltd.*, ECF 25 at 8, No. 2:19-cr-20503 (E.D. Mich. Jan. 31, 2020).

---

[2] A few SAs are directly imported for testing and product development purposes; these parts are not at issue in this appeal.

NHK's plea agreement explains that suspension assembly suppliers "exchanged . . . pricing information, including anticipated pricing quotes," "and used the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased" those parts. The "primary purpose" of this conspiracy was to "fix the prices of [hard disk drive] suspension assemblies sold in the United States and elsewhere." These centralized "pricing quotes" apparently were at the heart of how Seagate sourced suspension assemblies: Importantly for our case, although nearly all of Seagate's suspension assemblies were purchased by its foreign entities abroad, these foreign entities apparently lacked any authority to decide on any terms of purchase, whether price, quantity, or even the timing of their orders. Such parameters all were determined centrally by Seagate Technology LLC's Commodities Management Team ("CMT") in Minnesota. The foreign companies—primarily Seagate Thailand—simply entered orders into their purchase order systems at precisely the times, rates, and prices that CMT instructed them to enter.

Pricing was negotiated by Seagate CMT with suppliers quarterly. Although the master Product Supply Agreements between Seagate Technology LLC and each supplier contained some pricing terms (such as price floors, ceilings, or most-favored-nation provisions), these were average or expected prices—not actual transaction prices. Actual transaction prices were finalized by Seagate's CMT unit each quarter through bidding on an RFQ, or "Request for Quotation." First, Seagate Technology LLC would send a complex, custom grid to each supplier like NHK. The supplier placed its bids across several dimensions, such as prototypes, mass-production price, model, volume band, and program. These RFQ "responses" from suppliers were then

negotiated by Seagate Technology LLC's CMT on U.S. soil, along with the purchase volumes "allocated" to each supplier. Finally, the agreed-upon prices and volumes were sent by Seagate CMT to Seagate Thailand and Singapore to use to purchase suspension assemblies at the appropriate time.

These RFQ responses, called "anticipated pricing quotes" in NHK's plea agreement, also were the chief instrument that NHK would use to fix prices. First, NHK's head of American SA sales would discuss specific proposed RFQ responses for a given Seagate product with his competitors. Next, he would relay the contents of these discussions to top NHK executives in Yokohama, one of whom was later indicted for his role in the conspiracy, and another who candidly explained that NHK would use competitor pricing information "as reference" for its own RFQ responses. Finally, to entrench this process, NHK's head of American SA sales even tried to make a job posting for a position for NHK in Minnesota that included the requirement, "Find out competitor's information, pricing information"—because he "underst[oo]d that collecting competitor pricing information" simply was part of the job. When NHK executives in Yokohama caught wind of this, one of them advised, "Just scratch pricing information on competitors. That you can verbally tell once we hire."

## II. Procedural History

Shortly after NHK was sentenced in its criminal case, Seagate sued in the Northern District of California, alleging violations of the Sherman Act, violations of antitrust statutes in Minnesota and California, and common-law breach of contract. Seagate sought treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15(a), among other relief.

Seagate amended its complaint twice, in October 2020 and in April 2021.

While discovery was ongoing, NHK moved for Partial Summary Judgment Regarding Foreign Commerce. NHK alleged that Seagate's "direct purchaser claims arising from component sales that took place outside the U.S."—in other words, claims "based on sales of [suspension assemblies] billed and shipped to Seagate Thailand and Singapore"— were barred by the FTAIA. 15 U.S.C. § 6a. The FTAIA bars Sherman Act claims based on conduct involving "trade or commerce with foreign nations," unless that conduct (1) involves imported goods that Americans buy or (2) "has a direct, substantial, and reasonably foreseeable effect" on U.S. domestic commerce or certain exports and "such effect gives rise to" an independent Sherman Act claim. *Id.* NHK essentially argued that, for example, if a suspension assembly was bought by a Thai subsidiary in Thailand, this qualified as wholly foreign commerce ineligible for Sherman Act relief.

The district court at first agreed with NHK in part. In its May 15, 2023 order, the court found that most of the suspension assemblies purchased by Seagate Thailand and Seagate Singapore never entered the United States at any point. These were indeed "wholly foreign transactions," the court ruled, ineligible for Sherman Act relief. *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.* ("*In re HDD*"), No. 19-md-02918, 2023 WL 3483242, at *8 (N.D. Cal. May 15, 2023). But about one-third of Seagate's foreign suspension assembly purchases did eventually enter the U.S. as part of finished hard drives. True, these parts first were integrated into the hard drives overseas, and the FTAIA's import exclusion only covers conduct involving "import trade or import commerce." 15 U.S.C. § 6a. But the

court held that "the import . . . exclusion can be established without a showing that the defendants *themselves* shipped price-fixed goods into" the U.S. and thus denied summary judgment in part. *Id.* at *6 (emphasis added).

The district court changed direction when asked by NHK to reconsider. First, the court held that the defendant *did* have to directly ship the price-fixed goods into the United States for the import exclusion to apply, and no suspension assemblies were directly shipped to the U.S. here. *In re HDD*, 2023 WL 8007985, at *3 (Nov. 17, 2023 order). Next, the court held that Seagate also could not establish an "effect" on domestic trade or commerce "giv[ing] rise to" an independent Sherman Act claim. *Id.* at *5. Despite the collusive "agreements in the United States . . . whereby the prices for SAs . . . were set," it was "'the overall price-fixing conspiracy [that] proximately caused the effect abroad,'" the court held, and not those collusive agreements. *Id.* at *4 (quoting *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 988 (9th Cir. 2008) ("*In re DRAM*")). The district court thus granted NHK's partial summary judgment motion in full.

Finally, the court found Seagate's Second Amended Complaint did not include any "factual allegations that any Seagate Plaintiff indirectly purchased an SA or a product containing an SA." *Id.* at *5. The court denied leave to amend to add any such "indirect purchaser" claims, *id.* at *6, and it certified the May 15, 2023 and November 17, 2023 orders for interlocutory appeal.

Seagate advances several positions on appeal: (1) that the FTAIA does not apply to any of its claims, (2) that the domestic effects of NHK's price-fixing proximately caused Seagate's antitrust injuries abroad, and (3) that at least a

subset of its claims qualify as "import trade or commerce." *See* 15 U.S.C. § 6a. Seagate also argues that Seagate Technology LLC—rather than Seagate Thailand or Seagate Singapore—was the "direct purchaser" of all the suspension assemblies. We have jurisdiction under 28 U.S.C. § 1292(b), and we hold that Seagate's theory of domestic effects might be viable. We thus vacate the district court's orders and remand the case.

## DISCUSSION

"We review the district court's grant of summary judgment de novo." *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021) (citation omitted). We ask, "viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1021 (9th Cir. 2001) (citation omitted). We may address "any issue fairly included" within an order certified for appeal, "because it is the order that is appealable, and not the controlling question identified by the district court." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004) (citations omitted).

## I. The FTAIA places geographic limits on the reach of U.S. antitrust law.

Congress enacted the FTAIA in 1982 in part to clarify United States antitrust jurisdiction over international transactions—a question that had vexed our courts. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 n.23 (1993); *United States v. LSL Biotechnologies*, 379 F.3d 672,

677–78 (9th Cir. 2004).    The statute provides that the Sherman Act:

> shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
>> (1) such conduct has a direct, substantial, and reasonably foreseeable effect—
>>> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>>> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>> (2) such effect gives rise to a claim under the [Sherman Act].

15 U.S.C. § 6a.  In other words, the statute generally bars the Sherman Act from reaching foreign commercial activity, but then adds a caveat allowing jurisdiction for foreign commerce if the anticompetitive conduct  (1) involves "import trade or . . . commerce" (*i.e.*, goods imported into the United States and bought by Americans) or (2) sufficiently affects American domestic or (certain) export commerce that in turn proximately causes an antitrust injury.  *In re DRAM*, 546 F.3d at 985.  These limits ensure that the Sherman Act protects "*American* consumers and *American* exporters, not foreign consumers or producers," and does not overly burden U.S. companies' conduct overseas.  *Id.* at 986 (citation omitted).

The phrasing of the FTAIA has been called confusing at times, but the general thrust of the statute is clear. It underscores that American courts generally are not open to antitrust injuries occurring overseas, no matter how those injuries arise: "American exporters" and "firms doing business abroad" may "enter[] into business arrangements," no matter how "anticompetitive, as long as those arrangements adversely affect only foreign markets." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004) (citing House Report). If a foreign country does not forbid certain anticompetitive conduct, then American companies doing business there can engage in such conduct, even if it would be unlawful here. Otherwise, we would be disadvantaging American companies competing in foreign markets.

Congress thus did not expand the purview of our antitrust laws to reach "foreign conduct that causes independent foreign harm," except "where that conduct also causes domestic harm." *Id.* at 166. As this court has noted, a "transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws," unless specifically provided for by the FTAIA. *United States v. Hui Hsiung*, 778 F.3d 738, 754 (9th Cir. 2015) (quoting House Report).

Indeed, there is good reason to be circumspect when it comes to the Sherman Act's territorial scope. Beyond merely supporting American firms' competitiveness abroad, the Supreme Court has highlighted international comity and refraining from interfering in other countries' regulation of their own economies, at least where no Americans are harmed. *See, e.g.*, *Empagran*, 542 U.S. at 164–68. Even where it is an American-owned company that suffers

antitrust injury abroad, so long as that company chose to incorporate overseas, it must take the good with the bad when it comes to that country's legal regime. As the Seventh Circuit noted, a company cannot "pick and choose from the benefits . . . of [U.S.] corporate citizenship" by availing itself of the Sherman and Clayton Acts while avoiding compliance with United States tax, labor, and environmental requirements by choosing to do business through foreign entities. *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 822, 827 (7th Cir. 2015); *see also Empagran*, 542 U.S. at 166.

In short, American antitrust protections apply only when there is a direct and proximate link to U.S. harm. Congress provided a few ways to establish that link even where the ultimate antitrust injury occurs overseas.

First, "import trade" and "import commerce" are excluded from the FTAIA's ban on extraterritorial reach (*i.e.*, the Sherman Act applies). *See* 15 U.S.C. § 6a; *Hui Hsiung*, 778 F.3d at 754. For example, if Japanese carmakers fix prices of their cars in Japan but import them into the United States, then American antitrust laws would cover such conduct under the FTAIA's "import commerce" exclusion.

Second, the Sherman Act also applies to anticompetitive conduct (a) that has a harmful effect on domestic or (certain) export trade or commerce, and (b) such effect "gives rise to" an independent Sherman Act claim. 15 U.S.C. § 6a(1)–(2); *see Empagran*, 542 U.S. at 174. This is sometimes called the FTAIA's "domestic effects" exception.

We next turn to whether Seagate meets either the "import commerce" exclusion or the "domestic effects" exception under the FTAIA.[3]

## II. The FTAIA's "import commerce" exclusion does not apply because the SAs were not directly imported into the United States.

Seagate Thailand and Seagate Singapore bought price-fixed suspension assemblies outside the United States. One way these foreign entities could bring a Sherman Act claim for their purchases is if the suspension assemblies were directly imported into this country. NHK's price-fixing conduct would then be "conduct involving . . . import trade or . . . commerce," and would be exempt from the FTAIA's ban on extraterritorial application of U.S. antitrust law. 15 U.S.C. § 6a.

But NHK's price-fixing conduct did not involve "import trade or . . . commerce" because the suspension assemblies by themselves were not imported into the United States. Only the finished hard disk drives were imported into the United States. Any trade or commerce involving suspension assemblies was thus not "import trade or . . . commerce," but merely "trade or commerce . . . with foreign nations." *Id.*

A few factual clarifications may be helpful. First, Seagate does not dispute that none of the suspension assemblies at issue were directly sent to the United States

---

[3] Seagate argues that the FTAIA is not relevant here because this case involves price-fixing conduct that took place in the United States, while the FTAIA only covers "wholly foreign" commerce. Not so. The Supreme Court held that the FTAIA applied in *Empagran* even though "some of the anticompetitive price-fixing conduct alleged . . . took place in *America*," 542 U.S. at 163, 165, and we did the same in *Hui Hsiung*, 778 F.3d at 743, 753.

after Seagate bought them.  They were first incorporated into hard disk drive components and hard disk drives, which were later imported to the U.S.  Second, Seagate also concedes that it does not sell suspension assemblies—indeed, there is no consumer market for them, only for finished hard disk drives.

Seagate mainly relies on two related arguments to argue that the "import exclusion" applies:  (1) that a qualifying import need not be a direct import but may come through intermediate steps in "the supply chain," and (2) that the FTAIA exempts not only import trade and commerce but also "conduct *involving* . . . import commerce," which, again, includes the broader "supply chain."  Seagate thus argues that the one-third of suspension assemblies that later entered the U.S. as part of finished hard disk drives qualify as imports under the FTAIA, and that NHK's price-fixing activity constitutes conduct involving import trade.

These arguments are unconvincing.  For starters, we usually interpret words as "understood in their ordinary, everyday meanings."  Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 (2012).  And we have never defined "import trade or commerce" so broadly as to encompass parts incorporated into the imported goods.  Rather, we usually refer to the final end-product, not specific parts within it, when we talk about an imported good.  Take smartphones made by the South Korean company Samsung.  Many of its phones use batteries or other parts made in third countries such as China or Vietnam.  We would normally describe Samsung phones as imported goods from South Korea, despite some internal parts being made elsewhere.

In *Hui Hsiung*, we strongly suggested that the "import trade or commerce" exception in the FTAIA applies only to the final imported end-product. That case dealt with TFT–LCD liquid crystal display panels found in many computer screens. While the case involved both panels that were directly sold into the United States *and* panels first incorporated into computers abroad and then sold here, 778 F.3d at 753, we considered *only* panels that came directly to the U.S. (as panels) in analyzing "import trade," *see id.* at 755. We repeatedly emphasized that the defendant manufacturers sold panels "to customers in the United States." *Id.* And most of all, we explained that even though the defendants "did not manufacture any consumer products for importation into the United States," they "negotiated with United States companies in the United States to sell TFT–LCD panels at [fixed] prices . . . . [and] *[i]mportation of this critical component* of various electronic devices is surely 'import trade or import commerce.'" *Id.* at 756 (emphasis added). In other words, the display panels by themselves were imported as components in *Hui Hsiung*. We thus held that "transactions . . . directly between the U.S. plaintiff purchasers and the defendant cartel members *are* . . . import commerce," and "goods manufactured abroad and sold in the United States [are] import commerce." *Id.* at 755 (citations omitted). In contrast here, the suspension assemblies were neither purchased by buyers in the United States nor "sold" in (or into) the United States. In short, mere parts in the international supply chain lack sufficient U.S. nexus to justify the extraterritorial reach of American antitrust laws.

True, *Hui Hsiung* dealt with the sufficiency of an indictment and of evidence to support a jury verdict and thus did not define the outer limits of import trade. *See id.* at 755–

56 & n.8.  But nothing in the case suggests that it would include activities "up and down the supply chain," as Seagate suggests.  It is also true that suspension assemblies "have no use other than as a hard-drive component," as Seagate notes.   But Seagate fails to explain why this should work in its favor.  No circuit authority suggests that every foreign component cartel must have redressability under the FTAIA's import exclusion, seeing as relief may still be available under the statute's effects exceptions.  *See, e.g.*, *Hui Hsiung*, 778 F.3d at 760.

In sum, Seagate was harmed not in the import trade but several steps up in its manufacturing supply chain—and a "transaction between two foreign firms" typically must seek relief not through the FTAIA's import commerce exclusion but through the domestic effects exception.  *Id.* at 754.  We turn to that next.

### III.   The FTAIA's "domestic effects" exception might apply and allow Seagate to pursue its antitrust claims against NHK.

The    FTAIA    has    another    exception—"domestic effects"—that    allows    extraterritorial    application    of American antitrust law.  Foreign non-import commerce can fall within the Sherman Act if the anti-competitive conduct (1) has a "direct, substantial, and reasonably foreseeable effect" on certain U.S.-based commerce, and (2) *that effect* "gives rise to" an antitrust claim.  *See* 15 U.S.C. § 6a.  As the Supreme Court stated in *Empagran*, "there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on domestic commerce or a domestic competitor."   542 U.S. at 163 (quoting House Report); *accord Hui Hsiung*, 778 F.3d at 754.

The two requirements above are strict by design. A "direct" effect on U.S.-based commerce means the effect must "follow[] as an immediate consequence of the defendant's activity." *LSL*, 379 F.3d at 680; *see Hui Hsiung*, 778 F.3d at 758 & n.9. An "effect cannot be 'direct' where it depends on . . . uncertain intervening developments." *LSL*, 379 F.3d at 681. And to "give[] rise to" a Sherman Act claim means the effect (on U.S. commerce) must proximately cause the antitrust injury. *In re DRAM*, 546 F.3d at 988. "'[B]ut for' causation cannot suffice for the FTAIA," such as where intervening forces may have caused the ultimate antitrust injury. *Id.* at 987; *see Hui Hsiung*, 778 F.3d at 758.

Together, these requirements ensure there is a sufficient nexus to the United States such that we open our courts despite the foreign elements. They require a tight causal link between the defendant's anticompetitive conduct, the effect on U.S. commerce, and the ultimate antitrust injury. There must be a direct impact in the United States tethered to a Sherman Act violation. Put differently, U.S. courts are only open to foreign antitrust injuries that arise *through* harm to U.S. commerce. *See Empagran*, 542 U.S. at 174.

A. NHK's price-fixing had a harmful effect on U.S. domestic commerce.

We address the first prong of the domestic effects exception: Seagate must show that NHK's conduct caused an immediate harm to U.S. domestic commerce. *See id.* (requiring an adverse effect). Seagate asserts that "NHK colluded to rig bids in the United States, and the domestic effects of that conduct [were] distorted bidding, suppressed competition, and binding agreements incorporating price-fixed terms."

These facts are largely undisputed. NHK admits in its plea deal with the United States government that it agreed with another competitor "to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies to be sold *in the United States* and elsewhere." It further admits it "exchanged [suspension assembly] pricing information, including anticipated pricing quotes," with its competitor and "used the exchanged information to inform their negotiations with *U.S.* and foreign *customers that purchased HDD suspension assemblies*." The parties in their briefing have not identified how many of NHK's price-fixed SAs were sold within the United States or to American companies but NHK sold them to a wide range of companies, including Seagate, Toshiba, Western Digital, Quantum, IBM, Fujitsu, Samsung, and Hitachi, during the relevant period. While we do not know the dollar value of the price-fixed SAs sold in the United States, NHK in its plea deal conceded that "[d]uring the relevant period, the conspiracy . . . had a *direct, substantial, and reasonably foreseeable effect* on *interstate* and import trade [] commerce*." So NHK's plea agreement alone appears to confirm the first prong of the domestic effects exception: NHK admits to fixing prices of suspension assemblies sold in the United States (as well as around the world), and NHK's actions apparently had a direct, substantial, and reasonably foreseeable effect on U.S. commerce. *See* 15 U.S.C. § 6a(1).[4]

---

[4] NHK's argument that a corrupt U.S. bidding process can only constitute "*conduct*" under the FTAIA—and not an "*effect*" of conduct— betrays its plea deal that "the conspiracy involved and had a direct, substantial, and reasonably foreseeable effect on" interstate commerce. While the actual "stuff" of NHK's conspiracy (illicit meetings, illegal

To be sure, the domestic effect from NHK's anticompetitive conduct did not directly injure Seagate Technology LLC because it did not buy the suspension assemblies here—its foreign entities did abroad.  But the first prong of the domestic effects exception still has been met because NHK admitted in its plea deal that it "fix[ed] the prices" of "suspension assemblies to be *sold in the United States* and elsewhere."  (emphasis added).  In other words, NHK's price-fixing apparently had a significant and direct impact on domestic commerce because companies (other than Seagate Technology LLC) overpaid for the suspension assemblies bought here in the states.

The FTAIA's statutory language does not require more than that to satisfy the first prong:  The anticompetitive conduct must have "a direct, substantial, and reasonably effect on trade or commerce which is not trade or commerce with foreign nations [*i.e.*, domestic commerce] or on import trade or import commerce with foreign nations."  15 U.S.C. § 6a.  Unlike the second prong (which refers to a Sherman Act "claim" by the plaintiff), the first prong makes no mention of "claim" or "injury" by the plaintiff—it just requires a direct and substantial "effect" on the American economy.  Stated differently, the first prong does not require the plaintiff to have suffered an injury in the United States in addition to outside of it; indeed, if it did suffer harm in the United States, the FTAIA may not even apply.  We recognized this point in *In re DRAM*:  The plaintiff there was a "foreign consumer that made its purchases entirely outside

bids, and so on) count as conduct, "higher U.S. prices" can be a "domestic effect."  *In re DRAM*, 546 F.3d at 984, 988; *see also Empagran*, 542 U.S. at 175 (calling "higher prices in the United States" an "adverse domestic effect"); 15 U.S.C. § 1 (prohibiting conduct with the effect of restraining trade).

of the United States," but we assumed that the first prong of the domestic effects exception had been met because the conspiracy had "raise[ed] the price of DRAM to customers in both the United States and foreign countries." 546 F.3d at 989, 984. The plaintiff's claim in *In re DRAM*, however, failed because it could not meet the second prong that the domestic effect of higher U.S. prices proximately caused its foreign injury. *Id.* The D.C. Circuit appears to share our view of the first prong requirement of the domestic effects exception. *See Empagran S.A. v. F. Hoffman-LaRoche Ltd.*, 417 F.3d 1267, 1269 (D.C. Cir. 2005) (plaintiffs "need only demonstrate therefore that the U.S. effects of the [defendants'] allegedly anti-competitive conduct '[g]ave rise to' their claims" because the statutory text looks at the "situs of the *effects* of the allegedly anti-competitive conduct," not the "situs of the . . . resulting *injuries*") (emphasis added).

Similarly here, Seagate need not show that it was injured directly from the domestic effect of NHK's anticompetitive conduct here in America under the first prong of the domestic effects exception. It is enough to show that NHK's actions had a direct, substantial, and reasonably foreseeable effect on domestic commerce by fixing prices of suspension assemblies sold here. But that is not the end of the matter. Under the second prong, Seagate must show that this domestic effect gave "rise to a claim under the [Sherman Act]." *Id.* We address that next.

### B. The tainted RFQ prices potentially gave rise to Seagate's antitrust claims.

To meet the second prong of the domestic effects exception, Seagate must show that the harm of NHK's conduct on U.S. domestic commerce directly caused Seagate Thailand's and Seagate Singapore's respective overcharge

claims.  *See* 15 U.S.C. § 6a(2).  In other words, we ask whether "[o]ther actors or forces may have affected the foreign prices"—if so, then the plaintiff has not met the second prong.  *In re DRAM*, 546 F.3d at 988.

Most foreign injury claims fail at this step because it is often difficult to show that the harmful effect on U.S. domestic commerce proximately caused the foreign antitrust injury.  Too often the link is too speculative or attenuated.  Seagate's claim, however, appears to be viable because of the unique nature of how the master Product Supply Agreement and the quarterly RFQs—all negotiated in the United States by Seagate Technology LLC—set the U.S. prices for suspension assemblies, which in turn set the prices of the foreign suspension assembly purchases.  As discussed, Seagate has provided evidence that its foreign subsidiaries lacked any authority over the price, quantity, or timing of their orders.  They had to follow the lead of U.S.-based Seagate Technology LLC and entered orders at the (inflated) prices negotiated by Seagate Technology LLC's CMT unit.  At oral argument, NHK admitted that suspension assembly prices were negotiated not per transaction but "quarterly"— *i.e.*, through the RFQ process.  Thus, the higher U.S. prices for suspension assemblies resulting from NHK's price-fixing would have directly caused Seagate's foreign subsidiaries to overpay.  Or as Seagate would have it, there only was *one* price, the U.S. and foreign prices being "one and the same."

The district court credited this evidence in its May 15 order, finding that Seagate Technology LLC's U.S.-based "agreement[s] governed the sales when 'purchase orders' for SAs were placed by Seagate Thailand" including as to price. The court in its November 17 order also acknowledged Seagate's theory that "the prices for SAs to be charged to

Seagate entities located outside the United States were set" directly by the tainted "agreements in the [U.S.]." Yet the district court called this theory "essentially the same" as *In re DRAM*, 546 F.3d at 988–89. The court observed, "[T]hat the conspiracy had effects in the United States and abroad, does not show that the effect in the United States, rather than the overall price-fixing conspiracy itself, proximately caused the effect abroad." *In re HDD*, 2023 WL 8007985, at *4 (quoting *In re DRAM*, 546 F.3d at 988).

We believe the district court erred in reading *In re DRAM* as categorically holding that rigged U.S. prices cannot proximately cause injuries abroad. In that case, we rejected the tenuous theory that higher U.S. prices for computer memory chips (*i.e.,* the domestic effect) proximately caused higher global pricing (*i.e.*, the foreign injury) because the plaintiff relied on the interconnected nature of the computer memory chip market and the leading role of U.S. buyers. 546 F.3d at 984. Relying on a chain of inferences about global pricing of memory chips, the plaintiff in *In re DRAM* did "not sufficiently allege a theory that the higher U.S. prices proximately caused [the plaintiff's] foreign injury of having to pay higher prices outside the United States." *Id.* at 989. In short, there were links missing in the chain: "Other actors or forces may have affected the foreign prices." *Id.* at 988.

Seagate's theory, in contrast, is rooted in the certainty of binding pricing contracts—not the complex vagaries of the global pricing market. It does not rely on the alleged equivalence of prices across global trading markets that many courts have rejected. *See id*; *see also Empagran*, 542

U.S. at 175. [5]    Rather, Seagate explains exactly how "[d]efendants' activities resulted in the U.S. prices directly setting the worldwide price" and thus causing the foreign antitrust injury:  NHK and a competitor conspired to fix prices, setting inflated U.S. prices (*i.e.*, the domestic effect) that Seagate's foreign entities then accepted as a matter of company policy and contractual requirements (*i.e.*, the foreign injury).  *In re DRAM*, 546 F.3d at 989.

We acknowledge, however, that factual questions exist about whether the post-RFQ prices truly set and limited what the foreign subsidiaries could pay.  For example, was Seagate Singapore controlled just as Seagate Thailand was for suspension assembly purchases, and did they always use the same price?  These would be best for the district court to consider:  While we suspect Seagate has adduced enough evidence of a direct, proximate relationship to pass summary judgment, *see* 15 U.S.C. § 6a(2), we remand to assess this issue.

C. Foreign antitrust injury is only eligible for relief when U.S. commerce is first harmed.

We conclude with a few remarks on why this case is different from other cases involving foreign antitrust injuries.  Opening our federal courts to an injury like this one may seem extraordinary at first blush:  After all, a foreign

---

[5] In *Empagran*, the Court held that the "domestic effect" exception did not apply because it "assumed that the anticompetitive conduct here *independently* caused foreign injury; that is, the conduct's domestic effects did not help to bring about that foreign injury."  542 U.S. at 175 (emphasis added).  The Court used the word "independent" 35 times in the opinion, underscoring that the domestic effect must cause the foreign injury.  Here, Seagate appears to have adduced evidence that its foreign injuries are not independent of the conspiracy's domestic effects.

company bought a price-fixed good from another foreign company abroad. Why should that foreign company have access to our courts based on our laws? Indeed, the Seventh Circuit's decision in *Motorola*, 775 F.3d 816, offers valid reasons to tread cautiously in the realm of extraterritorial jurisdiction. Although that case ultimately was decided based on standing rather than the FTAIA, *see Hui Hsiung*, 778 F.3d at 760, it flagged the practical problems of redressing wholly foreign injuries in American courts.

> "[T]he immediate victims of the price fixing were [Motorola's] foreign subsidiaries, and . . . U.S. antitrust laws are not to be used for injury to foreign customers." *Motorola*, 775 F.3d at 820. "Companies operate overseas . . . to take advantage of many legal provisions of that country: labor law, environmental law, and tax law." *Id.* at 827. "The mind boggles at the . . . number of antitrust suits that major American corporations could file against the multitudinous suppliers of their prolific foreign subsidiaries if Motorola had its way." *Id.* at 826 (all citations omitted).

The court thus held that Motorola's parent entity—Motorola Mobility LLC—could not sue on its subsidiaries' behalf for the injuries the subsidiaries suffered abroad. *Id.* at 820, 825 (declining "to give Motorola rights to take the place of its foreign companies and sue on their behalf under U.S. antitrust law").

These appear valid points, but the facts and context of our case are significantly different. If we look deeper, our

holding is consistent with the Supreme Court's rule in *Empagran*, considerations of judicial policy, and the decisions of our sister circuits.

First off, the Seventh Circuit in *Motorola* did not substantially grapple with the FTAIA's language or the case law construing that statutory text, and instead only glancingly referenced them—perhaps because its holding was based on standing for a derivative buyer, not the FTAIA. As a policy matter, the Seventh Circuit advocated a bright-line rule that American courts should not entertain Sherman Act claims based on foreign injuries because the harmed parties could seek relief under the laws of the foreign country. *Motorola*, 775 F.3d at 820. But the parties here (correctly) agree that the FTAIA does not bar foreign injuries from relief under that statute so long as the required domestic effect and proximate cause are shown. As the Supreme Court has noted, "Congress [did not] place the relevant words 'gives rise to a claim' in the FTAIA to suggest any geographical limitation." *Empagran*, 542 U.S. at 174 (citing 15 U.S.C. § 6a); *see also Empagran*, 417 F.3d at 1269 ("FTAIA's 'domestic effects' requirement 'does not exclude all persons abroad from recovering under the antitrust laws of the United States'") (citation omitted). And as we explained earlier, the domestic effect of higher U.S. prices gave rise to the foreign injury suffered by Seagate Thailand and Seagate Singapore because they adopted those rigged U.S. pricing in buying the suspension assemblies.

Second, we are not confronted with a typical foreign injury here but rather a case suffused with domestic elements. Seagate Singapore and Seagate Thailand suffered injuries because of the price-fixing first inflicted *on U.S. soil* and suffered by *Americans*. NHK admitted it entered into a conspiracy to "fix the prices of . . . suspension assemblies to

be sold *in the United States* and elsewhere." Nearly all the misconduct in this case—whether bid rigging, illegal job posts, and so on—either targeted or centered on the United States because fixing U.S. commercial activity meant inflating the price of suspension assemblies everywhere. According to *Empagran*, the Sherman Act very much was intended to cover harm like this. 542 U.S. at 163. Put another way, if a claim for foreign injury passes the FTAIA's proximate cause test, then such foreign harm no longer is "independent" of the domestic harm that is properly the province of our courts—the harms are "intertwined." *Id.* at 166. Simply put, Americans too were harmed by NHK's price-fixing, even if foreign companies are the ones suing based on their injuries suffered abroad.[6] In such a unique scenario, we can and must allow civil claimants to claim damages, especially given the government's decision not to seek restitution in its criminal prosecution because of its assumption that civil remedies would be available to private parties.

And because the FTAIA imposes very stringent "direct effect" and proximate cause requirements, it ensures that any foreign injuries covered by the Sherman Act are the direct result of harm to United States commerce—just as Congress intended. *See Empagran*, 542 U.S. at 163 (citing House Report). Tenuous or speculative injuries will not pass this test. *See, e.g.*, *In re DRAM*, 546 F.3d at 989–90 (dismissing theory of causation that was too vague, speculative, and could not be explained by counsel at oral argument). Nor will indirect or modest effect on domestic commerce—it

---

[6] To be fair, Americans will not directly reap the benefits of any damages award in this case. But the deterrent effect on future anticompetitive behavior will still benefit the United States.

must be "direct" and "substantial." We thus do not see our decision as opening U.S. courts to a flood of lawsuits from suppliers overseas.

Finally, the international comity concerns raised in *Motorola* are addressed (or perhaps outweighed) by the price-fixing's substantial impact on United States commerce. *See* 775 F.3d at 824. As the Court noted in *Empagran*, we "have long held that application of our antitrust laws to foreign anticompetitive conduct is . . . consistent with principles of prescriptive comity[] insofar as they reflect a legislative effort to redress *domestic*" harm. 542 U.S. at 165. International comity may have to be cast aside when foreign misconduct harms Americans. When foreigners engage in unlawful behavior in the United States that harms Americans, we need not reflexively close our courthouse doors just because another foreign company takes the lead against such illegal conduct.

\* \* \* \*

Finally, we affirm the district court's determination that Seagate Thailand was not a mere purchasing agent for Seagate Technology LLC because it did not purchase the suspension assemblies "for" Seagate LLC but bought them for its own purposes. But the district court's statement that Seagate's Second Amended Complaint "includes no factual allegations that any Seagate Plaintiff indirectly purchased an SA or a product containing an SA" appears to be incorrect. While indirect purchases are not the focus of the Second Amended Complaint, it repeatedly alleges that Seagate Technology LLC bought suspension assemblies; these purchases necessarily were indirect. Moreover, Seagate's Sherman Act claim alleges that NHK "[sold] suspension assemblies to customers in the U.S. or elsewhere for

incorporation into *products sold in the U.S. at supracompetitive prices*"—which appears to state a pass-on theory of harm.

Because an allegation under FED. R. CIV. PROC. 8 does not require any magic words but only a short and plain statement of the claim, Seagate Technology LLC may be entitled to test whether its alleged high degree of control over Seagate Thailand and Seagate Singapore gives it standing to sue as an indirect purchaser of price-fixed suspension assemblies. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 n.16 (1977); *Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1123 n.1 (9th Cir. 2008) (recognizing "standing for an indirect purchaser if . . . the direct purchaser is owned or controlled by the indirect purchaser"); *see also In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 (9th Cir. 2012) ("[I]ndirect purchasers may sue when customers of the direct purchaser own or control the direct purchaser . . . ."). We leave it to the district court in the first instance to determine whether Seagate Technology LLC has a viable indirect purchaser claim under *Illinois Brick*.

## CONCLUSION

We vacate the district court's May 15, 2023 and November 17, 2023 orders granting partial summary judgment for NHK and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**